PEOPLE v. WELKE.

1. EVIDENCE—LIE-DETECTOR TEST—EXTORTION.
   Admission of evidence that a lie-detector test was given to defendant and that the person who gave it concluded and informed defendant that he was lying constituted reversible error in prosecution for extortion.

2. SAME—LIE-DETECTOR TEST.
   Results of a lie-detector test are not admissible in evidence.

3. CRIMINAL LAW—INSTRUCTIONS—REQUEST TO CHARGE—EVIDENCE.
   It is the duty of the trial court to cover in his charge to the jury in a criminal prosecution the theory upon which the defense is founded if a proper request therefor is made and supported by competent testimony.

4. SAME—INSTRUCTIONS—THEORY OF CASE—REQUEST TO CHARGE—EVIDENCE.
   It was reversible error for trial court merely to refer to summations of the case by the prosecuting attorney and counsel for defendant in prosecution for extortion and the testimony of

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 20 Am Jur, Evidence § 762.
[2] Physiological or psychological truth and deception tests. 23 ALR2d 1306.
[3, 4] 53 Am Jur, Trial § 650.
[5, 6] See, generally, 58 Am Jur, Witnesses §§ 621, 623.

the witnesses as presenting the theories of the case, where
defendant presented a proper request to charge and supported
it by competent evidence.

5. SAME—CROSS-EXAMINATION.
It is the duty of the trial court in a criminal prosecution to limit
cross-examination so as to prevent admission of testimony as
to unnecessary collateral and extraneous matters.

6. EXTORTION—PROFFERED EVIDENCE—ANIMUS.
It was error to deny defendant's proffered testimony, including
that of a handwriting expert, in prosecution for extortion,
whereby it was sought to be shown that there was an animus
on the part of the son of the complaining witness and that a
postcard had been forged by such son so as to make it appear
that defendant had plenty of money for airplane flights and
was contemplating leaving the country shortly before trial.

Appeal from the Recorder's Court of Detroit;
Maher (John J.), J. Submitted January 13, 1955.
(Docket No. 65, Calendar No. 45,994.) Decided
March 9, 1955.

William F. Welke was convicted of extortion. Re-
versed.

*Thomas M. Kavanagh,* Attorney General, *Ed-
mund E. Shepherd,* Solicitor General, *Gerald K.
O'Brien,* Prosecuting Attorney, and *Samuel Brezner,
Samuel J. Torina* and *Angelo A. Pentolino,* Assist-
ant Prosecuting Attorneys, for plaintiff.

*Davidow & Davidow (Larry S. Davidow* and
*David C. Pence,* of counsel), for defendant.

KELLY, J. In the spring of 1951 a jury in the re-
corder's court for the city of Detroit found defend-
ant William F. Welke guilty of extortion. He was
sentenced to not less than 5 nor more than 20 years
in the State prison of southern Michigan.

The complaining witness, Mrs. Katherine Vasu, testified that the following events occurred in the city of Detroit on May 31, 1949:

That on that day she received a telephone call at approximately 9:15 a. m. The call allegedly came from a Mr. Weber from the University of Michigan, inquiring as to the whereabouts of her son Cordell Vasu and stating that he had not slept in his room the previous night. Twenty minutes later another telephone call was received by Mrs. Vasu. The second caller had a different voice from that of the first caller. The second caller demanded of Mrs. Vasu $3,500 in $20 and $100 bills, stating that her son would be unharmed if the money was forthcoming. He inquired as to where she did her banking and she informed him that her bank was located in the General Motors building. She was told by the voice that a taxicab would pick her up; that she was to come to the bank, withdraw the money and wait outside on Grand boulevard. The cab arrived and took her to the bank. Mrs. Vasu had $3,500 at home in the denominations specified, but went to the bank and pretended to go in and withdraw the money. She then came outside and waited. A man appeared on her right and said, "Give me that money." She was able to see the left side of his face, which was bandaged. She described him as being about 30 to 35 years of age, 5'6" or 5'7" tall, weighing about 140 pounds, blond complexion, a high-pitched voice, blond hair, wearing a hat and a blue pin-striped suit, and with a large bandage on his face. She was told to wait there for 5 minutes before doing anything. The man then left and she waited about a minute before she approached an officer, who called a cab. She did not reveal to the officer what had transpired. She went to the Highland Park General Hospital where her husband was on the staff and reported what had happened, and then collapsed. A call was

put in to the Federal bureau of investigation and at their suggestion another call was made to Ann Arbor. It was then discovered that Cordell Vasu had been in school all morning and that nothing had happened to him.

On May 31, 1949, the defendant was a student at the University of Michigan, 23 years of age. He had enrolled as a freshman in the fall of 1946 after completing 2 years' service with the armed forces of the United States. The record discloses that on May 31, 1949, the defendant was 5'9" in height and weighed between 160 and 170 pounds and that his hair was brown.

Complainant's son, Cordell Vasu, had enrolled as a freshman at the University of Michigan in the fall of 1948 and was a resident of the same hall that defendant occupied.

Shortly after May 31, 1949, a general investigation by the Detroit police department was made of students at the University, particularly those who were residents in the hall in which defendant and Cordell Vasu resided. Cordell Vasu testified that he and his mother decided in the summer of 1949 that he should visit defendant's home and from observation try and determine whether defendant was the guilty person.

In the fall of 1949 the complainant visited her son at the University and was introduced by her son to the defendant. She testified that she did not form a conclusion at that time that he was the one who had obtained her $3,500, but that she informed the police that he resembled the extortionist.

On September 26, 1950, approximately 16 months after the day of extortion, defendant appeared at the Detroit police department for questioning, at their request. Throughout a day's interview he maintained his innocence and was allowed to go home that evening but was instructed to report in

the morning. The following morning he was immediately brought to a Sergeant Mareydt, who was then in charge of lie-detector tests. Sergeant Mareydt testified:

"I did see the defendant here, William Welke. That was on the 27th day of September, 1950, in the scientific laboratory. Lt. Maxon brought him up there for a polygraphic examine. Without going into the results of the polygraph or lie detector, I did have a conversation with him after that.  *  *  *

"There was a conversation between me and this defendant with reference to his guilt or innocence of the crime charged.

"*Q.* What was that conversation?

"*A.* On my part or the defendant's part?

"*Q.* Both of your parts; what did you say and what did he say?

"*A.* I told the defendant that he wasn't stating the truth, and our conversation continued until finally the defendant admitted to me that he had accomplished the extortion."

Welke testified that he had applied for service and training in the jet branch of the army air force and that he had received notice to report for active service shortly before he was called to the Detroit police department in September, 1950; that he made these facts known to the police officers who interviewed him the first day and again to Sergeant Mareydt who gave the lie-detector test the next day. He further testified that Mareydt was a colonel in the air force reserves and that Mareydt informed him that all the police department was interested in was getting the return of the $3,500 to Mrs. Vasu; that if he would pay this amount the case would be dropped against him and he could proceed forthwith and report to the army for induction into active service. Relying upon said inducement and fearing that the publicity would shatter his good name and any

chances to enter the army, even though he would be finally acquitted, he did make the confession but refused to sign said confession when he found that the promise to save him from publicity was not being kept. Sergeant Mareydt denied any such inducement had been made.

Appellant enumerates 97 assignments of error, claiming he was denied a fair and impartial trial by reason of the trial court's attitude and comments throughout the trial; that reversible error was committed in allowing in evidence testimony relative to a lie-detector test, and by the court's failure to charge the jury as to the theory of the defendant's case and refusal to admit into evidence the testimony of a handwriting expert relative to a card of inquiry addressed to the Pan American Airways. Defendant also contends the verdict is against the weight of the evidence.

We believe reversible error was committed by allowing the testimony that clearly disclosed to the jury that not only was the lie-detector test made but the fact that the man who made the test concluded and informed the defendant he was lying. The fact that the exact results of the test were not testified to does not correct this error. It is a well-accepted principle in this State that results of a lie-detector test are not admissible in evidence.

We also believe that reversible error was committed by the trial court's refusal to state the theory of the defendant's case. The court's instructions were confined to the law applicable, and the court excused his refusal to state the theory of defendant's case by stating that:

"Through the respective attorneys during the summation of the case and also through the testimony of witnesses from the witness stand, the respective theories have been called to your atten-

tion. There is no need for me to further summarize or mention them."

This Court in *People* v. *Hoefle,* 276 Mich 428, 431, stated:

"A careful reading of the court's charge discloses that this request was not given nor was it covered by any portion of the charge to the jury. Instead the charge, insofar as it outlined the theory of defense, was wholly confined to another issue of fact presented by the testimony, to-wit, that defendant subsequent to taking and using the money, believing he had a right to do so, decided to retain it and apply it in payment on an indebtedness which he claimed was due him from Mr. Rands. This we think deprived defendant of a fair trial. It is the duty of a trial court, if proper request is made, to cover in the charge to the jury the theory upon which the defense is founded, if it is supported by competent testimony."

In *People* v. *Lane,* 304 Mich 29, 34, this Court said:

"However, this theory of the defense was specifically called to the attention of the court and it was the duty of the court to cover it fairly in the charge to the jury."

Cordell Vasu, during cross-examination, was shown a postcard mailed from Ann Arbor on November 8, 1950, to the Pan American Airways requesting information in regard to flights to South America and signed "W. F. Welke." Cordell Vasu denied that the writing on the card and the signature "W. F. Welke" was in his handwriting. He then admitted that a registration card shown him was in his handwriting. When defense counsel endeavored to introduce these 2 cards in evidence with the statement that he would introduce expert testimony to prove that Cordell Vasu had written the card and forged defendant Welke's name, the State

objected to the introduction. The court sustained the objection, and when the defense called to the witness stand the handwriting expert the court refused to allow the witness to testify.

It was defendant's theory that the forging of this postcard by Cordell Vasu not only showed an animus on Vasu's part, but that it was deliberately forged to make it appear that defendant had plenty of money for airplane flights and was contemplating leaving the country shortly before trial.

It is 'the duty of the trial court to limit cross-examination so as to exclude unnecessary, collateral, and extraneous matters. The nature of this case is such, however, that we believe that defendant should have been entitled to make proof as to whether complainant's son wrote the card and made it appear that it was in defendant's handwriting.

We do not deem it necessary to comment upon other assignments of error as we do not believe they will occur in another trial.

Reversed and remanded.

CARR, C. J., and BUTZEL, SMITH, BOYLES, REID, and DETHMERS, JJ., concurred.

SHARPE, J., did not sit.