**Henry MARKS, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 5793.**

United States Court of Appeals
Tenth Circuit.

Oct. 13, 1958.

Certiorari Denied Jan. 12, 1959.
See 79 S.Ct. 315.

Everett M. Grantham, Albuquerque, N. M. (Grantham, Spann & Sanchez, Al-

buquerque, N. M., were with him on the brief), for appellant.

James A. Borland, U. S. Atty., Albuquerque, N. M., for appellee.

Before BRATTON, Chief Judge, and HUXMAN and LEWIS, Circuit Judges.

HUXMAN, Circuit Judge.

Appellant, Henry Marks, was indicted, tried and convicted by a jury in the United States District Court for the District of New Mexico of violating 18 U.S.C.A. § 201. The indictment charged that he offered and gave a bribe of $1,000 to an Officer of the United States, a Special Agent for the Internal Revenue Service, with intent to influence his decision in a matter pending before the Agent at the time. His appeal challenges the judgment of the Court on five grounds. The assignments of error will be considered in the following order.

It is urged that the Court erred in permitting the case to go to the jury, because of the insufficiency of the evidence to sustain a verdict of guilty. To resolve this question, it will be necessary to consider primarily the evidence of the prosecuting witness, Peter F. Geissler, and of appellant, Henry Marks. Geissler was an Agent of the United States Internal Revenue Department assigned to Albuquerque, New Mexico. In his official capacity, he was engaged in investigating the income tax returns of Hub Enterprises, Inc., of which Marks was the Managing Officer. During the investigation, Marks paid Geissler $1,000 in cash to influence his action in the investigation. The whole case turned on whether the giving of the bribe originated with Marks, or whether the suggestion of giving a bribe came first from Geissler, and whether Marks then took the bait offered by the Agent.

Geissler, the prosecuting witness, testified in substance as follows: On March 11, 1957, he and Agent Butler contacted Marks at appellant's place of business and informed him that the returns of Hub Enterprises for the years 1953, 1954 and 1955 were under investigation. On March 28, Geissler and Butler had a conference with Marks at his office with reference to certain records. A number of conferences were held between the parties, at which various matters pertinent to the investigation were discussed. On April 24, Geissler called Marks at his office to ascertain what progress he was making in securing certain required data. Marks replied that he was assembling the data and suggested they have a cup of coffee together. Geissler suggested they meet at the Court Cafe. Marks replied that it was too crowded and suggested they meet at the corner of Second and Silver. Before Geissler went to the meeting, he suggested to his Associates that he be searched. He was searched and all his money except forty-five cents was taken from him. Before meeting Marks, Geissler suggested that he be put under surveillance. He then left for the rendezvous where he met Marks. Marks suggested that they take a ride, but Geissler declined. Marks then suggested they have a cup of coffee at the City Cafe. They went to the Cafe where they occupied a booth. Marks asked how the investigation was coming. He inquired about Geissler's son's health, and also asked if he had a sewing machine. Geissler replied, "No," but that he could use one. Marks suggested that he would like to send one to the house. He also asked whether Geissler had a Frigidaire. He replied he had a second hand one and Marks suggested he could send a new one very cheap. Marks also inquired whether Geissler's wife was employed. When he was informed that she was a secretary but was unemployed, Marks stated that he and a group were forming a new concern and could use a secretary and would be glad to give his wife consideration. After considerable discussion, Marks said, "Pete, I would like to see this matter brought to a halt, to clean it up" and he said, "I would give you a thousand dollars to terminate the investigation." Geissler's reply was "That is up to you." Marks went to the bank to get the $1,000, and they agreed to meet at the Hilton Drug Store. About ten minutes later, they met at the

Hilton Drug Store. After some colloquy, the money was passed across under the table. Geissler took it and informed Marks that he was under arrest. Marks was then delivered to the Federal authorities.

Wilson, a Special Agent, testified that he searched Geissler before he met Marks and took his money from him; that he kept Geissler under surveillance; that he saw him and Marks in the City Cafe; that he heard some of the conversation between Geissler and Marks in the booth; that he heard Marks say, "How is it going?" and Geissler replied, "Well, he was working on it"; that he heard the word sewing machine mentioned, but because of the noise he could not hear much of the conversation. He went to the Hilton Hotel, but did not see Geissler, and finally returned to the office.

With respect to the occurrences on the 24th, Marks testified that Geissler called him and asked about the closing costs on a house transaction and that he replied he would give him the information when it was furnished to him, and that Geissler then said, "Let's have a cup of coffee," to which he replied to come over and meet him at his place. Geissler replied that he would meet him at the corner of Second and Silver; that they met there and went from there to the coffee shop; that they sat down and both ordered a cup of coffee; that while sitting in the booth Geissler said, "Do you have a thousand dollars for me to close this case?"; that he replied "Well, I don't have a thousand dollars for you"; I said, "I would have to borrow the thousand dollars if you want a thousand dollars": and he said, "I have a sick kid and I don't make much money." He testified that Geissler also told him his wife wasn't working and he had a sick kid and was not making much money. Marks testified positively that he never offered Geissler any money to take care of the case and that the suggestion for the money came first from Geissler; that Geissler personally asked him for $1,000 to settle the case and that Geissler said, "I could make it good or bad for you."

Mrs. Marks testified that she listened in on an extension phone to the conversation on the 24th between Geissler and her husband, and that Geissler made the suggestion that he and Marks meet for coffee.

■ From the above outline of the evidence must be determined whether the Government made a case to go to the jury. There is no conflict or uncertainty in the applicable principles of law to determine the burden resting on the Government to make a jury case. There was a sharp and irreconcilable conflict in the evidence. Geissler testified positively that the first suggestion of a bribe came from Marks and that at no time had he suggested a pay-off to him. Marks, on the other hand, testified just as positively that the suggestion of the payment of $1,000 came from Geissler, and that at no time did he offer to pay him $1,000 to settle the case, and that he paid the $1,000 only after he had been first solicited by Geissler. If the jury believed Marks, there was entrapment, and he could not be convicted of the offense charged. On the other hand, if the jury believed Geissler, as it evidently did, Marks was guilty of the offense with which he was charged. The case was properly submitted to the jury for its determination.

■ It is urged that the Court erred in refusing to give appellant's instructions Number 1 and 2.[1] We do not

---

1. "Defendant's Requested Instruction No. 1.

"Since members of this jury panel have sat in a number of criminal cases at this term of court in which informers or decoys were used by the Government for the purpose of detecting crime, the Court feels constrained to give you the following cautionary instruction.

"There is a difference, in law, between the use of informers and decoys for the purpose above set out and the entrapment of a defendant by an agent of an investigative agency of the United States. There are many instances where it is necessary to resort to the use of decoys for such purposes, and no criticism can be offered for such method.

consider whether appellant properly preserved his right to challenge the Court's instructions by making timely and proper objections thereto, because we believe the Court correctly instructed the jury as to the law of entrapment. A defendant is not entitled to have the Court instruct the jury in any paricular words or in the language of his requested instruction.[2] If adequate and proper instructions are given, he has no cause for complaint.

■ The Court gave careful consideration to its instruction on entrapment. The substance of the Court's instruction was that if the jury believed from the evidence that Marks was induced to violate the law by the insistence, requests and persuasions of Geissler, then the verdict must be not guilty, because it was not the policy of the courts to uphold a conviction where the offense was committed through the instigation of the Government's agents. The Court told the jury that when an officer induces one to violate the law, who has no intention

> "On the other hand, the Government of the United States frowns on the entrapment of one of its citizens by an officer or agent charged with the duty of investigating alleged offenses against the United States. The question for determination is: As between the prosecuting witness and the defendant, in whose mind did the idea of a bribe or gratuity originate? Therefore, in this case, if you find and believe from the evidence and beyond a reasonable doubt that the idea for the tendering of a bribe or gratuity originated in the mind of the defendant Henry Marks and that he was the aggressor in offering, tendering and giving such a bribe or gratuity to the prosecuting witness, if such a bribe was offered, tendered and given, then your verdict should be guilty.
> "If, on the other hand, you fail to find from the evidence to your satisfaction and beyond a reasonable doubt that the idea of a bribe or gratuity originated in the mind of the defendant Henry Marks, then your verdict should be not guilty. It is not necessary that the defendant Marks prove beyond a reasonable doubt that such an idea originated in the mind of the prosecuting witness; the converse of this proposition is true; that is, that the jury must find and believe

of committing crime, the Courts will not lend their aid in punishing a person thus lured into crime. But the Court said that if the defendant acted with a willingness and desire to violate the law and makes an offer, tender or gift as his own idea, then he would be guilty. This is the substance of what the Court told the jury and clearly states the principles applicable to entrapment. From the Court's instruction, the jury could have no difficulty in concluding that the decisive question was, did the offer of the bribe first originate in the mind of Marks or did he only offer the bribe after it was first suggested by Geissler. The complaint that the instruction did not specifically state that the Government must disprove entrapment beyond a reasonable doubt is not well taken. Throughout the instructions, the Court repeatedly told the jury that the Government must prove every element of the offense to the jury's satisfaction beyond a reasonable doubt. It was not necessary to repeat this admonition in every instruction.

> from the evidence and beyond a reasonable doubt that such an idea originated with the defendant Marks in order to return a verdict of guilty."
> Defendant's Requested Instruction No. 2.
> "You are instructed that evidence has been introduced by the prosecution tending to show that at the time of the alleged acts of the defendant, the defendant Marks was under investigation by the prosecuting witness Geissler in his official capacity concerning a matter in connection with income tax returns filed by the defendant. That such an investigation was pending is one of the material allegations which the Government must prove to your satisfaction and beyond a reasonable doubt in order for you to return a verdict of 'guilty' to the charge contained in the indictment in this case. However, whether the defendant is or is not guilty of any offense, and whether the defendant is or is not liable civilly or criminally, in connection with such investigation is wholly immaterial in this case. The jury should not speculate as to what such an investigation, if pending, will or will not disclose."

**2.** Watts v. United States, 10 Cir., 212 F.2d 275; and cases there cited.

▮ Appellant complains because the Court refused to give his requested instruction Number 2, in which he requested the Court to tell the jury that in determining whether Marks was guilty of the charge it must not consider whether he was civilly or criminally liable in connection with the investigation of his income tax status. It is contended that this instruction was warranted by the testimony of Geissler that Marks' tax liability was under investigation. But that testimony was only preliminary to laying the foundation to establish why Geissler contacted Marks. There was nothing therein from which one could draw the conclusion that Marks was civilly or criminally liable.

▮ Complaint is made of the ruling of the Court refusing appellant's offer to introduce in evidence the result of a lie-detector test, to which he submitted. Appellant's attorney, with commendable candor, concedes that the authorities do not generally sustain him in this connection. He nonetheless asks us to consider the question and give our approval to the use of such testimony. The question apparently was first considered by the federal courts in Frye v. United States, 54 App.D.C. 46, 293 F. 1013, 1014. The Court there rejected the use of such evidence and as a reason therefor stated:

" * * * Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which

the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

"We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made."

Since then, a considerable number of courts have considered such evidence and with the exception of People v. Kenny, 167 Miss. 51, 3 N.Y.S.2d 348, they have refused to receive such evidence, adopting in substance the statement quoted from the Frye case, supra. While we have not exhausted the authorities, some of the cases so holding are listed in footnote three.[3] We have considered the question and are inclined to hold to the reasoning of the courts which have refused to receive such evidence.

It is further urged that the Court erred in permitting the jury to hear and consider statements attributed to one Scanlon and in failing to strike such testimony upon motion and objection. A consideration of this assignment requires a statement as to Scanlon's place in the picture. James Scanlon was know casually to Geissler as a tax consultant and former Special Agent of the Intelligence Division. Scanlon contacted Geissler in Albuquerque on March 23, 1957, and again on March 24, and told Geissler that he might be called into the Marks case. So far as the record shows, those were the only dates on which Geissler and Scanlon met personally. On direct examination, Geissler testified that he had a telephone conversation with Scanlon on

3. People v. Wochnick, 98 Cal.App.2d 124, 219 P.2d 70; Frye v. United States, 54 App.D.C. 46, 293 F. 1013; Henderson v. State, 94 Okl.Cr. 45, 230 P.2d 495, 23 A.L.R.2d 1292; Commonwealth ex rel. Riccio v. Dilworth, 179 Pa.Super. 64, 115 A.2d 865; Kaminski v. State, Fla., 63 So.2d 339; State v. Bohner, 210 Wis. 651, 246 N.W. 314, 86 A.L.R. 611; State v. Kolander, 236 Minn. 209, 52 N.W.2d 458; People v. Welke, 342 Mich. 164, 68 N.W.2d 759; People v. Davis, 343 Mich. 348, 72 N.W.2d 269.

April 21, the call originating from Briar Cliff, New York; that as a result of that conversation he made a report to his superiors. When he was asked to state the substance of the report, an objection was sustained on the ground that the answer called for hearsay. Nothing further was developed on direct examination by the prosecution with respect to Scanlon. On cross-examination, Geissler was asked, "Now, as a matter of fact, Mr. Geissler, who first suggested the sum of one thousand dollars to be paid to you in this case?" The answer was "Mr. Scanlon." Appellant's attorney then moved that the answer be stricken on the ground there was no evidence of agency, and also on the ground that it was hearsay.

■ There is no evidence which would support a finding that Scanlon was Marks' agent authorized to act for him in the matter under investigation. But the admissibility of the answer does not depend upon whether Scanlon was Marks' agent. Neither did the question call for hearsay, as contended for by appellant. Geissler was not asked to repeat the conversation with Scanlon. That would be hearsay. All that was asked was the name of the person who first suggested the bribe to him. That called for a fact answer. Had Geissler refused to give the name, he could have been compelled to answer. Had he been asked what Scanlon said, or in whose behalf he offered the bribe, that would have been hearsay. We find no error in the Court's refusal to strike the challenged evidence.

■■ Finally, it is urged that the judgment should be reversed because of misconduct on the part of the District Attorney in his closing argument to the jury. In his closing argument, the District Attorney said that Scanlon was then under investigation. There is no basis in the record warranting such a statement. It was improper and should not have been made. The defendant objected to the statement at the time it was made, asked that it be withdrawn from the jury, and the jury instructed to disregard it. The motion was not sustained by the Court.

After the jury had been deliberating for some time, they were called into the courtroom at 6:09 p. m. and informed they might go to dinner. At that time, the Court on its own volition brought up the matter of the challenged part of the argument and stated to defendant's attorney that if he desired the Court would instruct the jury to disregard the District Attorney's statement that Scanlon was under investigation. Receiving an affirmative answer, the Court instructed the jury that "during Mr. Borland's closing argument he referred to the fact that the man Scanlon was under investigation in New York. And, I instruct you now that you will disregard that remark by the District Attorney as you further consider your deliberations in this case."

It is not all misconduct or improper argument that will require granting a new trial or a reversal on appeal. It is only when such conduct can present a question whether there is reason to believe that it influenced the jury's verdict that the failure to take appropriate steps to remove it will warrant a reversal. While, as stated, the remark was improper, it was as to a collateral matter and it is doubtful whether it could have influenced the jury. While the Court did not withdraw the remarks from the jury's consideration and instruct it not to consider them at the precise time they were made, it did so shortly thereafter while the jury was still considering the case. It is our conclusion that the Court's further instruction to the jury with respect to these remarks, while the jury was still considering the case, was sufficient to remove any impression the jury might have gained from the remarks and that its verdict was not influenced thereby.

A careful consideration of the entire record leads us to the conclusion that there is no reversible error and the judgment is, therefore, Affirmed.