PEOPLE v. FRECHETTE.

1. Evidence—Lie-Detector Test.
    Results of lie-detector test are not admissible in evidence.

2. Homicide—Lie-Detector Test—Appeal and Error—Evidence.
    Prejudicial error in trial on charge of first-degree murder *held*, committed in the admission of testimony of an expert as to how a polygraph worked, the results of other tests, and the fact that defendant had taken a lie-detector test, and in permitting the question whether the expert had an opinion as to the truth of statements by defendant, although the question was not answered because of defense counsel's objection (CL 1948, § 750.316).

3. Appeal and Error—Refusal to Take Lie-Detector Test.
    Testimony of refusal to take a lie-detector test, even though this testimony is finally stricken and the jury instructed to disregard it, constitutes prejudicial error and entitles a defendant to a new trial.

---

References for Points in Headnotes
[1, 2] 29 Am Jur 2d, Evidence § 831.
    Physiological or psychological truth and deception tests.    23 ALR2d 1306.
[3, 4] 29 Am Jur 2d, Evidence § 296.
[5] 39 Am Jur, New Trial § 154.
[6] 5 Am Jur 2d, Appeal and Error § 760.

4. HOMICIDE—JURY—POLYGRAPH—IMPROPER INFLUENCE.

Jury in first-degree murder trial may have been improperly influenced, where it was told by an expert witness about the accuracy of the operation of a polygraph, informed that defendant had taken a test, told that the expert did have an opinion as to whether defendant was lying, and then refused the information as to the result of his test (CL 1948, § 750-.316).

5. NEW TRIAL—MOTIONS—LOSS OF RECORD—HOMICIDE.

Denial of new trial to defendant convicted of first-degree murder, because the sparse record preserved after 30 years would not support a conclusion that there was a miscarriage of justice, *held*, error, where the record was lost by death of the stenographer who had taken the testimony after denial of defendant's 2 motions to preserve the record (CL 1948, § 750-.316).

6. APPEAL AND ERROR—QUESTIONS REVIEWABLE—MISCARRIAGE OF JUSTICE—SENSATIONAL PRESS COVERAGE—POLYGRAPH TESTS.

Whether a miscarriage of justice resulted from the sensational press coverage of first-degree murder trial of defendant is not determined, where new trial is granted because of prejudicial error committed with reference to polygraph testimony (CL 1948, § 750.316).

Appeal from Court of Appeals, Division 2; T. G. Kavanagh, P. J., Burns and McGregor, JJ., affirming Livingston, Collins (Joseph H.), J. Submitted November 9, 1967. (Calendar No. 29, Docket No. 51,494.) Decided February 9, 1968.

3 Mich App 249, reversed and a new trial granted.

Clarence R. Frechette was convicted of first-degree murder. Affirmed in Court of Appeals. Defendant appeals. Reversed and new trial granted.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Charles B. Gatesman,* Prosecuting Attorney, for the people.

*E. Reed Fletcher,* for defendant.

T. M. Kavanagh, J. Defendant-appellant is presently serving a life sentence for first-degree murder.* An order granting a delayed appeal was entered September 13, 1965, by the Court of Appeals. The Court of Appeals decided that appellant was not entitled to a new trial, even though there was serious doubt in the mind of that Court that defendant received a fair trial. (3 Mich App 249.) Leave to appeal was granted by this Court on November 14, 1966. (378 Mich 738.)

Because much of the record has been lost, we are furnished only excerpts from some of the testimony. Appellant supplies most of the facts, and the prosecution opens its fact statement in its brief with the following: "There is essentially no dispute about the facts involved in this case."

Defendant Frechette was convicted on March 28, 1935, of the murder of his employer, one Robert Brown, near Howell, Michigan. Defendant was riding in an automobile owned and driven by Brown. Brown stopped the car and, while both were standing outside the car, Brown made a derogatory remark regarding Frechette's girl friend. A fight ensued and Frechette struck Brown, knocking him to the ground. Frechette, believing he was fired from his job and would not get a ride back to Howell, turned to walk in that direction. As he did so, he saw Brown reach into the glove compartment of the car and pull out a gun. Frechette grabbed Brown's gun hand and in the ensuing struggle the gun was discharged twice, killing Brown. There were no witnesses to the shooting.

Frechette placed the body of Brown in the trunk of the car and, after having spent the night at his father's home at Oxbow Lake, left the next day for Detroit and then for Kalamazoo. The following two

---

* CL 1948, § 750.316 (Stat Ann 1954 Rev § 28.548).—Reporter.

days, with the body concealed in the trunk, accompanied by a girl of his acquaintance, he visited Benton Harbor and Grand Rapids and then returned to Kalamazoo. On February 1st he left Kalamazoo for California, and when he was apprehended at Truckee, California, near the Nevada border, the body was discovered.

The case attracted nationwide publicity, which is evidenced by the many newspaper clippings incorporated in appellant's brief and also affidavits as to the conduct of the trial.

That Frechette had taken a lie-detector test was testified to at his trial, and as the lie detector or polygraph was a new instrument used in crime detection there were 15 pages of testimony as to how it operated and the accuracy of many tests. The expert who was testifying was asked if he had an opinion as to whether Frechette made a truthful or untruthful answer. His reply was, "Yes, I have." Defense counsel then objected to the opinion of the expert. The trial court sustained the objection and went on to state:

"I might amplify the reason why the court sustains the objection to the introduction of the report and records known as polygrams. In regard to the offering in evidence of the record known as polygrams made by the apparatus known as a lie detector used on the defendant in this case, the court is of the opinion that as yet, as a matter of law, such an instrument is not perfected to such an extent that its record of any test made by it should be used or received in evidence in court."

The trial court further said:

"I will state on the record, that is the statement of counsel permitting the examining in relation to the polygrams, that he didn't claim for it perfection at all, but thought he would introduce it and leave

it to the consideration of the jury, that is what he stated at the time; however, the court is of the opinion, as I already stated, it wouldn't be of any evidential value to the jury on account of—well, it seems to the court an uncertainty and to admit it perhaps would be prejudicial in view of the objection of the defendant."

The trial court did not instruct the jury to disregard the numerous reports of polygraph tests or for that matter to disregard the answer of the expert as to his opinion of whether Frechette was lying. In an attempt to counteract the damage already done, the appellant, out of the presence of the jury, stated he would be willing to take a polygraph test in front of the jury. This request was denied by the court.

Appellant contends that the admission of the testimony concerning the lie-detector test was error and he should therefore be granted a new trial. In connection with the nationwide publicity, appellant contends that as all the jurors had heard radio news reports or read about the case in the newspapers, he was deprived of his right to a fair trial.

The first issue for determination is whether the admission of the 15 pages of testimony of the expert witness concerning the operation of the polygraph and the results of numerous tests, including appellant's test, and the operator's opinion as to whether appellant was telling the truth, was error; and if so, whether it was prejudicial error.

There can be no doubt at present that in this jurisdiction the results of lie-detector tests are inadmissible. *People* v. *Becker* (1942), 300 Mich 562; *People* v. *Welke* (1955), 342 Mich 164; *Stone* v. *Earp* (1951), 331 Mich 606; *People* v. *Davis* (1955), 343 Mich 348.

Speaking of the lie detector, the Court in *People* v. *Davis, supra,* stated (p 372):

"The tremendous weight which such tests would necessarily carry in the minds of a jury requires us to be most careful regarding their admission into evidence and we should not do so before its accuracy and general scientific acceptance and standardization are clearly shown."

In *People* v. *Welke, supra,* the Court stated (p 169):

"We believe reversible error was committed by allowing the testimony that clearly disclosed to the jury that not only was the lie-detector test made but the fact that the man who made the test concluded and informed the defendant he was lying. *The fact that the exact results of the test were not testified to does not correct this error.* It is a well-accepted principle in this State that results of a lie-detector test are not admissible in evidence." (Emphasis supplied.)

In the case before us we note that approximately 15 pages of testimony were given by the expert witness as to the operation of the polygraph machine, the accuracy of the machine, and the results of many tests which were intended to show that this type of machine was accurate. The expert witness was asked if Frechette had been given a lie-detector test, and answered affirmatively. The sheets showing the results of the test were then shown to the expert and he testified they were of the Frechette examination. He was asked:

"*Q.* From the reading of those grams did you form an opinion as to whether or not the subject, Clarence Frechette, made a truthful or untruthful answer to any particular question on the gram?

"*A.* Yes, I have."

Objection was then made by defense counsel.

The trial judge ruled that to admit further testimony and to elicit the results of the polygraph test would perhaps be prejudicial.

In the case of *State* v. *Britt* (1959), 235 SC 395
(111 SE2d 669, 684, 685), the court was considering
lie-detector tests and the fact was admitted that the
defendant had merely refused to take a test. The
court stated (p 423):

"The record reveals that the witness Faulk, who
qualified as an expert with reference to the lie-
detector machine and in giving of tests thereby,
described in detail the mechanisms and operation
of such machine, and over objection he was per-
mitted to testify. 'The question you asked, I be-
lieve, is how many actually refuse to take the lie-
detector test. Less than 1% refuse to take the test
even though they are known criminals.' In our
opinion, permitting the witness to so testify was
very damaging and highly prejudicial to the appel-
lant Britt."

It was then noted that *the trial judge had told
the jury not to consider this testimony* when deter-
mining the issue of the guilt of the defendant. Of
this that court said (pp 425, 426):

"What effect the testimony as to the reputation
of the appellant Britt and of his failure to take a
lie-detector test had upon the jury is only known
to the members thereof. We reach the conclusion
that it could have affected the verdict in his case.
*When it is made to appear that anything has oc-
curred which may have improperly influenced the
action of the jury, the accused should be granted a
new trial, although he may appear to be ever so
guilty, because it may be said that his guilt has not
been ascertained in the manner prescribed by law.*
"We are convinced that the testimony directing
the attention of the jurors to the fact that the ap-
pellant Britt had been guilty of previous crimes,
and the testimony of his refusal to take a lie-
detector test, *even though this testimony was finally
stricken out and the jury instructed to disregard*

*the same, constitutes prejudicial error and entitles him to a new trial."* (Emphasis supplied.)

In the case at bar the court did not even instruct the jury that they should disregard the lie-detector testimony.

In the case of *State* v. *Driver* (1962), 38 NJ 255 (183 A2d 655, 658), the prosecutor's statement to the jury informed them that the defendant had refused to take a lie-detector test. Of this the court said (pp 260, 261):

*"No objection was made by defense counsel but we regard the references as so highly improper as to constitute plain error.* The State's case against Driver was based upon circumstantial evidence to a substantial degree and alleged oral admissions by him. In such a case particularly, to tell a jury of laymen at the very outset of the trial that defendant refused a number of times to take a lie-detector test was to create a probable aura of prejudice which would permeate the proceeding to the very end." (Emphasis supplied.)

The only possible defense in the case before us was based solely on the testimony of appellant as to the circumstances surrounding Brown's death. He was convicted primarily on circumstantial evidence and his conduct subsequent to the alleged murder. By eliciting the expert testimony, the prosecution showed that the appellant could not be believed more effectively than if the results of his tests would have been given to the jury.

The Court of Appeals stated in its opinion (3 Mich App 249, 253):

"The defendant asserts that the only inference the jury could draw from the testimony (and presumably the remarks of the prosecutor and the judge) was that the defendant was objecting to the

admission of a scientific conclusion that the defendant was guilty in order to hide the fact from them."

The Court of Appeals further stated (p 253):

"While it is true that the jury *might* draw such an inference we cannot agree that it is the only inference they could draw. An inference which to us seems *more probable* is that at one point or other the *defendant lied in his response to some test question.*

"But here the defendant's veracity was squarely before the jury, for he took the stand in his own defense *and the jury considered his credibility under wholly proper instructions.*" (Emphasis supplied.)

With these statements we strongly disagree. The jury having been told by the expert witness about the accuracy of the operation of the polygraph and been informed that defendant had taken a test, and having been told that the expert did have an opinion as to whether defendant was lying, and then been refused the information as to the results of his test, the jury may have been improperly influenced. See *State* v. *Britt, supra.*

In the Detroit News on Sunday, October 6, 1935, an article appeared concerning lie-detector tests. On page 3 thereof the author made reference to the Frechette trial, stating:

"Tappan and Berriman tried to place the polygraph evidence before the jury, but Sweeney's objection was upheld by Judge Joseph H. Collins in circuit court. Judge Collins followed the precedent of other jurists when he ruled that the instrument had not been proved infallible. *In their verdict of guilty, however, the jury unconsciously approved the test findings.*" (Emphasis supplied.)

We hold the admission of the testimony of the expert as to how the polygraph worked, the results

of other tests, and the fact that appellant had taken a lie-detector test, was prejudicial error. We further hold it was prejudicial error to permit the questioning as to whether or not the expert had an opinion as to the truth of the statements made by appellant.

When the trial court ruled, it ruled only as to the opinion question and the results of appellant's tests. The court not only failed to tell the jury to disregard these two matters, but also failed to tell them to disregard the extensive testimony with regard to the polygraph.

The Court of Appeals also stated in its opinion (p 254):

"The sensational press coverage of this killing indicated in the clippings attached as exhibits raises serious doubts about the fairness of the trial in the community from which these jurors came. Although they all indicated prior knowledge of the case—either by reading press accounts or hearing radio news broadcasts—or both, *this sparse record will not support a conclusion that there was a miscarriage of justice.*" (Emphasis supplied.)

It will be noted from the statements of defense counsel on oral argument and also from a look at the circuit court file, that two motions had been filed by appellant while in prison to have the record preserved. These motions were made and denied by the trial court in 1951 and 1952, before the death of the stenographer who had taken the testimony. It would clearly be unjust to hold that appellant should be denied a new trial because the record was lost after the court denied his motions to preserve it.

While we agree with the Court of Appeals that "the sensational press coverage of this killing indicated in the clippings attached as exhibits raises serious doubts about the fairness of the trial in the

community from which these jurors came," since we hold that the judgment must be reversed and a new trial granted upon the prejudicial error committed with reference to the polygraph testimony, we do not concern ourselves with alleged miscarriage of justice in connection with the press coverage.

The judgment is reversed and a new trial granted.

DETHMERS, C. J., and KELLY, SOURIS, O'HARA, ADAMS, and BRENNAN, JJ., concurred with T. M. KAVANAGH, J.

BLACK, J., concurred in result.