PEOPLE v LEROY GOODWIN

1. CRIMINAL LAW—EVIDENCE—POLYGRAPH—APPEAL AND ERROR.

Objection at trial is not required to preserve the issue of admission of polygraph test results into evidence where such evidence is introduced on two separate occasions and is neither brief nor inadvertent, but is calculated to affect the jury's opinion as to the credibility of the crucial prosecution witness, and where a police officer testifies as to the reliability of such tests.

2. DRUGS AND NARCOTICS—LICENSES—CRIMINAL LAW.

An affidavit from the State Board of Pharmacy stating that an individual is not licensed to sell or dispense narcotic drugs is *prima facie* proof of lack of licensing in a trial in which the existence or nonexistence of such a license is a material question (MCLA 335.54).

3. DRUGS AND NARCOTICS—EVIDENCE—JUDICIAL ADMISSION—UNDISPUTED FACT—INSTRUCTIONS TO JURY.

A judge may not state that a fact is admitted when there is any testimony whatsoever that raises a question of fact; but where the criminal defendant introduced no evidence to support the conclusion that he was licensed to handle narcotic drugs and where defendant admitted in court that he did not have a license the judge may instruct the jury that the question of the nonexistence of the license is settled and is not before them for determination.

Appeal from Kent, George V. Boucher, J. Sub-

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error §§ 545, 549.

29 Am Jur 2d, Evidence § 831.

Physiological or psychological truth and deception tests, 23 ALR2d 1306.

[2] 25 Am Jur 2d, Drugs and Narcotics §§ 44, 47.

51 Am Jur 2d, Licenses and Permits §§ 79, 80.

[3] 53 Am Jur, Trial § 604.

51 Am Jur 2d, Licenses and Permits § 80.

mitted Division 3 April 10, 1972, at Grand Rapids. (Docket No. 11195.) Decided May 25, 1972.

Leroy Goodwin was convicted of selling heroin without a license. Defendant appeals. Reversed and remanded for a new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *James K. Miller,* Prosecuting Attorney, and *Donald A. Johnston, III,* Chief Appellate Attorney, for the people.

*Arthur J. Tarnow,* State Appellate Defender, and *David A. Goldstein,* Assistant Defender, for defendant.

Before: J. H. GILLIS, P. J., and R. B. BURNS and DANHOF, JJ.

J. H. GILLIS, P. J. Defendant appeals as of right his jury-based conviction of selling narcotics without a license, MCLA 335.152; MSA 18.1122.

Defendant was charged with unlawfully selling heroin to informant James Booker in the City of Grand Rapids on April 2, 1970. The following evidence was elicited at trial through the testimony of various prosecution witnesses: On the night in question, Booker was driven by two police officers to defendant's apartment. After being searched by the officers and given $20 to make the "buy", informant Booker entered defendant's apartment. Having indicated his desire to purchase some heroin, defendant informed him he had none. However, being in need of a fix himself, defendant agreed to make a buy for Booker in return for being able to keep some of the heroin for himself. Booker then left the apartment and informed the officers, who had remained nearby,

that he would need a cab and $5 more. Returning shortly to defendant's residence, Booker and defendant proceeded to take a cab to a house on the other side of town. Defendant got out of the cab, entered the house, and upon returning gave Booker a yellow wad of paper containing four capsules of white powder. The cab then returned to defendant's address, letting him out. The vehicle continued down the street a few blocks and stopped, letting Booker off. Booker then gave the waiting officers the packet of capsules which the crime detection laboratory subsequently identified as containing heroin. Approximately eight weeks later, defendant was placed under arrest.

It was established during the course of trial that neither police officer observed the alleged exchange of heroin, but, in fact, their corroboratory observations were limited to (1) the physical movements of the two men which took place outside defendant's apartment, and (2) identification of the accused. The cab driver testified at trial that he could not recall anything of the whole trip. Hence, since the prosecution's case rested upon the credibility of informant Booker, the major tactic employed by defendant, who was proceeding *in propria persona,* was an attempt to destroy the credibility of the state's chief witness. On cross-examination, the defendant delved into the record of James Booker, who conceded an arrest and conviction for possession of marijuana. He went on to say that he had decided to work for the police when he was in jail, having been arrested for larceny in a building. As a witness's "interest" in the prosecution is an important factor affecting credibility, the defense attempted to establish that in return for Booker's cooperation in procuring heroin convictions, the police had agreed to drop

the prosecution of the charge pending against him. To refute the inference that one of his charges was dropped as *quid pro quo* for informing, and, hence, to boost his credibility in the eyes of the jury, Booker proffered the following without objection by the defense:

"*Q.* You were arrested lately and convicted of larceny from a building?

"*A.* No.

"*Q.* You were not convicted?

"*A.* No.

"*Q.* Was this dropped?

"*A.* Was it dropped?

"*Q.* Yes.

"*A.* I was arrested for investigation of larceny. No, investigation of breaking and entering. *And I submitted, in fact I requested a polygraph, which proved that I did not have any involvement in it whatsoever.*

"*Q.* On the contrary, Mr. Booker, a polygraph test doesn't prove anything, yet, does it?

"*A.* You're asking me and I answered it to the best of my knowledge.

"*Q.* You proved, though, to the polygraph test—

"*A.* Beg your pardon?

"*Q.* You proved this with a polygraph test?

"*A.* Yes." (Emphasis supplied.)

Booker's reliability was further attacked during the course of trial when he conceded on cross-examination that on two separate occasions he had given the police false information which resulted in arrests for sale of heroin. In one case, Booker had testified falsely at the preliminary examination. Both charges were subsequently dismissed when Booker admitted that he had "framed" both would-be defendants. To counter the inference that heroin prosecutions rest upon the whims of informants and to suggest Booker was not lying in the

case at bar, a police officer, on direct examination, testified as to the results of a polygraph examination to "prove" Booker had eventually told the truth in those instances where he recanted.

"*A.* Yes. We had conversation with Mr. Booker and he was just ready to testify in one of our preliminary examinations. Officer Hoogerheide and myself at that time told him that when he got on the stand he was only to tell the truth. It was sometime after this that he related that he had given us false information and we then investigated this, went through a polygraph examination and we determined that Mr. Booker. was telling us the truth, as far as these two cases. They were—this information was then taken to the prosecutor's office and it was decided at this time that these cases should be dismissed, and were.
"*Q.* Immediately?
"*A.* Immediately."

On cross-examination of the officer by the defendant, the following colloquy transpired:

"*Q.* Mr. VanTuinen, starting with the last question, why isn't polygraph results admissible as evidence in court?
"*A.* Why?
"*Q.* Yes.
"*A.* I don't know. They just have not been accepted as in-court—as testimony in court.
"*Q.* You don't know?
"*A.* I know they have not been accepted as—
"*Q.* Why haven't they been accepted? Can you answer that for me, please?
"*A.* * * * Possibly because they have not been in operation long enough to say that this—they are actually facts when they show that the person is using deception or not.
"*Q.* Wouldn't you consider approximately 30 years long enough?

"*A.* I don't know how long they have been in evidence.

"*Q.* Would it be because these tests—the results are nonconclusive and unreliable and nothing can really be based on these tests?

"*A.* I don't think that is true.

"*Q.* You don't think that is true?

"*A.* No."

The first issue for determination is whether the above instances of the admission into evidence of testimony regarding polygraph tests given to the state's chief witness was error; and, if so, whether it was prejudicial error. It is a long-standing rule in Michigan jurisprudence that the results of polygraph tests are not admissible in evidence. *People v Frechette,* 380 Mich 64, 68 (1968); *People v Becker,* 300 Mich 562 (1942); *People v Davis,* 343 Mich 348 (1955); *People v Baker,* 7 Mich App 471 (1967). This rule includes polygraph tests given to both the defendant and any witnesses.

Speaking of the lie detector, the Court in *Davis, supra,* stated, p 372:

"The tremendous weight which such tests would necessarily carry in the minds of a jury requires us to be most careful regarding their admission into evidence and we should not do so before its accuracy and general scientific acceptance and standardization are clearly shown."

Defendant acknowledges that the alleged error in admitting testimony regarding polygraph tests was not objected to at trial. Nor was there any request for the court to instruct the jury that they should disregard the lie detector testimony.[1] Nev-

[1] "If evidence of the fact of a polygraph test be admitted or improper argument about it be made even though no objection to either be interposed, the court should instruct the jury as to the unreliability of such tests. Nevertheless, appellant did not request that such

ertheless, he asserts that this does not preclude the error being raised here for the first time. It is a settled rule that if appellant fails to raise a proper objection to alleged errors at trial, he is not entitled to raise them on appeal for the first time. See *Baker, supra,* p 474; *People v Borowski,* 330 Mich 120 (1951); *People v Martin,* 1 Mich App 265 (1965). However, this Court, in observing this general rule, will exercise its "prerogative of searching for error which reflects clear injustice", *People v Hicks,* 2 Mich App 461, 463 (1966), and, hence, will reverse such a case on appeal where necessary to avoid a miscarriage of justice. *Baker, supra,* p 475; *People v Tyrer,* 19 Mich App 48, 51.

"The inherent power of this Court to prevent fundamental injustice is not limited by what appellant is entitled to as a matter of right." *People v Dorrikas,* 354 Mich 303, 316 (1958).

In considering the possible prejudicial effect of the inadmissible evidence in the case at bar, it is significant to note that reference was made to polygraph tests on two separate occasions by different state witnesses. In both instances said reference was neither brief nor inadvertent, but, on the contrary, was a clear attempt to rehabilitate and restore informant Booker's credibility. In both situations the *results* of the test were testified to in the jury's presence.[2] The problem was further aggravated by the police officer testifying as to the

instructions be given and therefore cannot now complain of the court's failure to give proper instructions. *Nuccio v Severini,* 374 Mich 189 (1965); *Hunt v Deming,* 375 Mich 581 (1965)." *People v Baker,* 7 Mich App 471, 476 (1967).

[2] Compare the above factors with those in *People v Tyrer,* 19 Mich App 48, 51 (1969), where the Court concluded that the prejudicial effect of the admission of polygraph testimony was not such as to constitute a miscarriage of justice. For a *contra* result, see *People v Frechette,* 380 Mich 64 (1968).

reliability of such tests. Furthermore, it is pointed out that informant Booker's testimony was the crucial aspect of the prosecution's case and impeaching his credibility became defendant's major tactic of defense. In light of all the above, we reach the conclusion that the introduction of the inadmissible evidence may well have improperly influenced the jury's verdict in this case so as to constitute a miscarriage of justice. The accused thus becomes entitled to a new trial.

Although having already granted a reversal in this case, we feel it necessary, in light of the ordered retrial, to consider the only other meritorious issue raised by defendant: Did the trial court commit reversible error by invading the province of the jury and usurping its factfinding function with regard to the element of lack of license in the offense charged?

In order to prove the requisite element of "not having a license" contained in MCLA 335.152; MSA 18.1122, the prosecution introduced into evidence an affidavit from the department of licensing and regulation of the State Board of Pharmacy stating that on the date in question the defendant did not have a license to sell or dispense narcotic drugs.[3] The following colloquy discloses the proceedings that took place:

"*Mr. Kloote:* Your Honor, I would like to submit as evidence of non-license an affidavit, Exhibit 4, an affidavit from the Department of Licensing and Regulation, the Board of Pharmacy, Lansing, Michigan, indicating that Mr. Goodwin did not have a license to sell or dispense heroin on the date in question. We move it into evidence at this time, your Honor.

"*The Court:* Any objection, Mr. Goodwin?

---

[3] Having been received into evidence, it becomes *prima facie* proof of the facts stated therein. MCLA 335.54a; MSA 18.1074(1).

*"The Defendant: (Examining)* Yes, your Honor. That there is no significance to me. It is—*I do not deny the fact that I don't have a license or a license to prescribe or administer drugs in any way, or sell,* but this is just paper. I mean, it doesn't make any difference. I mean, doesn't mean anything to me." (Emphasis supplied.)

Thereupon the exhibit was received into evidence by the trial court.

During its instructions to the jury, the court charged, in part, as follows:

"The statute prohibits any such sale or dispensing by an unlicensed person. There is no claim made here by the defendant that he was licensed by law to sell or dispense narcotics. The question of whether or not the defendant was duly licensed is therefore not before you and need not be determined by you."

The Courts of this state have recognized that lack of license is an element of the offense charged under MCLA 335.152; MSA 18.1122, *People v Mallory,* 2 Mich App 359 (1966); *People v Cardenas,* 21 Mich App 636 (1970), and that the prosecution has the burden of proof beyond a reasonable doubt. *People v Rios,* 386 Mich 172 (1971). However, it is equally well recognized that the prosecution may be relieved of the necessity of proving an essential fact which is admitted in a statement on the record by defense counsel. *People v Clark,* 6 Mich App 526, 530 (1967). The Court in *Ortega v Lenderink,* 382 Mich 218, 222 (1969), in examining several Michigan cases involving this issue, summarized their holdings thusly:

" * * * A statement made by a party or his counsel, in the course of trial, is considered a binding judicial admission if it is a distinct, formal, solemn admission made for the express purpose of, *inter alia,* dispensing with the formal proof of some fact at trial."

While it is true that a judge "may not state that a fact is admitted, when there is any testimony whatsoever that raises a question of fact", *People v Burlingame,* 257 Mich 252 (1932), no such testimony exists here. No evidence having been presented to contradict the affidavit of non-license, defendant, having made a judicial admission, is bound thereby. Consequently, it was not error for the trial court to take the issue of non-license away from the jury's consideration.

Reversed and remanded.

All concurred.