PEOPLE *v.* MARSH

Opinion of the Court

1. Criminal Law—Retrial—Failure to Challenge Applicability of Miranda Requirement—Appeal and Error.

Where defendant was convicted prior to the effective date of the *Miranda* warning requirement (June 13, 1966), and retried thereafter, and on the retrial the trial judge held his statement inadmissible because of failure to give the *Miranda* warning, and the People failed to challenge, either at the retrial or on the appeal from the conviction after retrial, the applicability of the requirement at retrial, the significance of the failure to give the required warning will not be decided on appeal and the statements of defendant will be deemed inadmissible as the trial judge held.

2. Same—Due Process—Evidence—Confession—Impeachment.

Trial court's allowing prosecution to inquire, both on cross-examination of defendant and by calling other witnesses, into certain admissions and statements made by defendant in 1941, which were themselves inadmissible in evidence, for impeachment purposes after defendant had said on direct examination that he had never admitted the murder in question *held,* reversible error; for evidence inadmissible if defendant does not take the stand is equally inadmissible if he does take the stand.

3. Same—Due Process—Trial—Argument of Counsel.

Prosecutor's reference in summation to statements made by defendant that were inadmissible in evidence, to rebut defendant's assertion that he had never had a chance to tell his story *held,* improper.

References for Points in Headnotes

[1] 5 Am Jur 2d, Appeal and Error § 744 *et seq.*
29 Am Jur 2d, Evidence § 555 *et seq.*
[2, 5–7] 58 Am Jur, Witnesses § 773.
[3] 53 Am Jur, Trial § 469 *et seq.*
[4] 54 Am Jur, United States Courts § 217.

4. CONSTITUTIONAL LAW—WAIVER OF RIGHTS—FEDERAL QUESTION.
   The claim that a federally guaranteed constitutional right has been waived presents a question controlled by Federal law.

5. CRIMINAL LAW—WAIVER OF RIGHTS—EVIDENCE—PRESUMPTION.
   Defendant does not open door to the use of an inadmissible confessional statement by denying in response to his attorney's questioning that he ever had made it.

### DISSENTING OPINION
### SULLIVAN, J.

6. CRIMINAL LAW — DUE PROCESS — EVIDENCE — CONFESSION — WITNESSES — IMPEACHMENT.
   *Reference by prosecution during cross-examination of defendant, and by means of a rebuttal witness, to a voluntary but inadmissible confession solely to impeach defendant's denial of guilt on his direct examination is permissible.*

7. SAME—DUE PROCESS—PRIVILEGE AGAINST SELF-INCRIMINATION—CROSS-EXAMINATION OF DEFENDANT—IMPEACHMENT.
   *Defendant in a criminal case cannot be forced to take the stand; but once he does, he opens the door to the use of his prior voluntarily made contradictory statements to impeach him.*

Appeal from Lenawee, Martin (Rex B.), J.   Submitted Division 2 August 2, 1967, at Lansing.  (Docket No. 2,844.)   Decided December 2, 1968.   Leave to appeal granted February 20, 1969.   381 Mich 804.

Fred Charles Marsh was convicted of first degree murder in 1941.  New trial granted in 1966.  Defendant again convicted of first degree murder.  Defendant appeals.  Reversed and remanded for new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Harvey A. Koselka,* Prosecuting Attorney, for the people.

*J. C. Beardsley,* for defendant.

Levin, J. In 1941, Fred Marsh was convicted of first degree murder following his plea of guilty. In 1966, the circuit judge granted Marsh a new trial because of deficiencies in his 1941 conviction. Prior to the new trial, on the authority of *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974), the judge suppressed a written statement given by Marsh in 1941 to the prosecuting attorney.

At the new trial Marsh testified. He did not deny killing Herman Berger. The question for jury decision was whether the defendant was guilty of first or second degree murder, manslaughter or not guilty. The jury's verdict was first degree murder.

Marsh claims that the circuit judge erred in allowing, for the purpose of impeachment, questions to be put to him and testimony concerning the suppressed 1941 written statement given the prosecutor and oral statements allegedly made by Marsh to police officers shortly after he was apprehended.

At the time of the crime Marsh was 22 years old, a 5th-grade drop-out, a well-known waif with no settled residence, living in a relatively small town. He slept wherever a bed might be offered him. For a living he did "odd jobs" about town and was employed by, among others, Chaloner's store, of which Berger was manager.

Marsh testified at trial that on the night of the crime he went to Berger's apartment to request a place to sleep for the night, that after a few moments conversation and refusal of the request Berger "started calling me [Marsh] thieves. Jumped up from the chair and pushed me, got in a struggle." Defendant remembered struggling with Berger and tying Berger's tie around his neck. Evidence showed Berger's death was caused by severance of a nerve, which in turn resulted from a ruler being pushed

down his throat. A bottle of ink was poured into Berger's mouth, but that was not the cause of death.

Marsh claims that after the struggle Berger became quiet, ceased calling him "names," he became frightened, saw Berger's wallet and key chain on a nearby desk [from which the ruler and ink were taken] and ran with these.

On the key chain was the Chaloner's store key, which defendant used to enter the store. There he took from the unlocked store safe some $200 and American Express receipts. The receipts were thrown away. Three cash registers containing money were untouched. Later that night Marsh left town by taxi for Toledo, Ohio. He was apprehended by police on a bus in Pennsylvania and brought back to Lenawee county for trial.

On the trip from Pennsylvania to Michigan statements concerning the killing were allegedly made by Marsh to the accompanying officers. When Marsh reached Michigan he gave the written statement, suppressed in 1966, to the assistant prosecuting attorney, was arraigned, pleaded guilty, was examined by a sanity commission and convicted of first degree murder and sentenced to life imprisonment.

At the 1966 trial Marsh testified on direct examination:

"*Q.* Now, have you ever stated, admitted anything of the sort that you intended to rob Chaloner's store or to rob Mr. Berger?

"*A.* No, sir, I never made such a statement.

"*Q.* Did you intend to do so?

"*A.* No, sir.

"*Q.* Did you intend to kill Herman?

"*A.* No, sir.

"*Q.* Did you intend to kill Herman, even during the struggle?

"*A.* No, sir."

Over objection the circuit judge allowed the prosecutor to question Marsh on cross-examination concerning the 1941 written and oral statements for the purpose of impeaching Marsh's testimony that he did not intend to kill or rob Berger and had never admitted to anyone he did. Also over objection, the prosecutor was allowed to question one of the officers who escorted Marsh from Pennsylvania concerning oral statements allegedly made during that journey. The circuit judge gave three reasons for his rulings: (1) the statements were "proper, legal rebuttal" to defendant's direct testimony that he did not go to Berger's apartment to rob and that he told no one he did, (2) the statements, though inadmissible in chief, were "voluntary" because not "coerced" in the traditional sense, and (3) by questioning defendant on direct examination about the statements, defense counsel "lifted the lid  *  *  * and opened the door" to their use as means of impeachment.

## I.

In *Johnson* v. *New Jersey* (1966), 384 US 719 (86 S Ct 1772, 16 L Ed 2d 882), the United States Supreme Court held *Miranda* applicable only to trials beginning after the *Miranda* decision date, June 13, 1966. Marsh was originally convicted 25 years prior to *Miranda*. The trial which resulted in the conviction from which he appeals followed *Miranda*.

Neither at trial nor on this appeal have the people contended that *Miranda* is inapplicable in a case such as this where the defendant was originally convicted prior to *Miranda* and newly tried[1] after

---

[1] Following Marsh's 1941 plea of guilty, the court, pursuant to CL 1929, § 16710 (presently CL 1948, § 750.318 [Stat Ann 1954 Rev § 28.550]), examined witnesses "to determine the degree of the crime." Proceedings to determine the degree of guilt are not necessarily to be regarded as a "trial." See *People* v. *Roberts* (1920), 211 Mich 187, 193.

*Miranda.* Accordingly, that question is not before us and is not decided.[2] We intimate no opinion thereon. We defer consideration of that question to a case where it has been properly raised and briefed. Resolution of that question would require thorough exploration of the policies involved in retrospectivity-prospectivity,[3] and the problem of possible decisional conflict between State and Federal courts within the State.[4]

We note that this Court has held the prospective decision of *People* v. *Hamilton* (1960), 359 Mich 410, applicable to a retrial where the original trial occurred before *Hamilton* but a new trial was grant-

---

[2] Of the 16 cases we find touching the problem, 11 decide *Miranda* should apply at retrials: *Gibson* v. *United States* (CA 5, 1966), 363 F2d 146; *State* v. *Brock* (1966), 101 Ariz 168 (416 P2d 601); *State* v. *Shoffner* (1966), 31 Wis 2d 412 (143 NW2d 458); *People* v. *Doherty* (1967), 67 Cal 2d 9 (59 Cal Rptr 857, 429 P2d 177); *State* v. *Bradshaw* (1966), — RI — (221 A2d 815); *United States, ex rel. Pierce*, v. *Pinto* (D NJ, 1966), 259 F Supp 729, aff'd (CA 3, 1967), 374 F2d 472, reversed *per curiam* on other grounds *sub nom Pinto* v. *Pierce* (1967), 389 US 31 (88 S Ct 192, 19 L Ed 2d 31); *State* v. *Ruiz* (1966), 49 Hawaii 504 (421 P2d 305); *Creech* v. *Commonwealth* (Ky, 1967) (412 SW2d 245); *People* v. *Sayers* (1967), 28 App Div 2d 227 (284 NYS2d 481); *State* v. *McCarther* (1966), 197 Kan 279 (416 P2d 290); *State* v. *Jackson* (1967), 270 NC 773 (155 SE2d 236). Five decide *Miranda* should' not apply: *People* v. *LaBelle* (1967), 53 Misc 2d 111 (277 NYS2d 847); *State* v. *Vigliano* (1967), 50 NJ 51 (232 A2d 129); *People* v. *Worley* (1967), 37 Ill 2d 439 (227 NE2d 746); *Jenkins* v. *State* (1967), — Del — (230 A2d 262); *Boone* v. *State of Maryland* (1968), 3 Md App 11 (237 A2d 787). See, also, the dissenting opinion in *People* v. *Sayers, supra,* 28 App Div 2d 227, 230–232 (284 NYS2d 481, 482, 484).

The United States Supreme Court has granted certiorari to review *Jenkins* v. *State*, supra, 37 L W 3184, November 19, 1968.

[3] See *People* v. *Doherty* and *State* v. *Vigliano, supra* footnote 2, for divergent holdings but good discussions of the policies underlying prospectivity in *Miranda.* See, also, *People* v. *Fordyce* (1966), 378 Mich 208, 211, where the Court noted the disruption of judicial administration which would result if new trials could be granted on the ground of *Miranda.* Marsh's new trial was not granted on that ground.

[4] Compare the holding in *Commonwealth* v. *Little* (1967), 210 Pa Super 418, (232 A2d 637), with *United States, ex rel. Smith* v. *Brierly* (ED Pa, 1967), 267 F Supp 274, and *United States, ex rel. Staino*, v. *Brierly* (ED Pa, 1967), 269 F Supp 753.

ed on grounds other than *Hamilton*. *People* v. *Besonen* (1966), 4 Mich App 131, 139.

The failure of the people to challenge *Miranda's* applicability on this appeal precludes[5] the issue from being raised at the time of the new trial herein ordered and makes it unnecessary on this appeal to consider the significance of failure to give the *Miranda* required warnings where the question is one of voluntariness in the traditional sense in a case governed by pre-*Miranda* law.[6]

Nor do the people assert that the accused's oral statements are governed by a rule different from that applicable to the written statement.[7]

For the purposes of this opinion we proceed on the assumption that the 1941 confession, as the trial judge found, is inadmissible.

## II.

Prior to *Miranda* the majority rule was that an "involuntary or not properly qualified confession may not be used to impeach an accused person who takes the witness stand in his own behalf." For decisions supporting and opposing that view, see

---

[5] As a general rule, parties will not be permitted to present their claims piecemeal. *State* v. *Loveless* (1944), 62 Nev 312 (150 P2d 1015, 1017); 5B CJS, Appeal and Error § 1825, p 197. In view of the length of this litigation that rule is here invoked.

[6] In this connection see the United States Supreme Court's observations in *Davis* v. *North Carolina* (1966), 384 US 737, 740, 741 (86 S Ct 1761, 16 L Ed 2d 895). See, also, *Clewis* v. *Texas* (1967) 386 US 707, 709, 710 (87 S Ct 1338, 18 L Ed 2d 423); *Coyote* v. *United States* (CA 10, 1967) 380 F2d 305, 309, 310; *Townsend* v. *Sain* (1963), 372 US 293, 308, n 4 (83 S Ct 745, 9 L Ed 2d 770); see, also, *People* v. *Hamilton, supra; People* v. *Besonen, supra.*

[7] *People* v. *Underwood* (1964), 61 Cal 2d 113, 120, 121 (37 Cal Rptr 313, 317, 389 P2d 937, 941). The *Miranda* rule applies without distinction to both "confessions" and "admissions." *Miranda* v. *Arizona, supra,* p 476. Likewise, this Court in *People* v. *Besonen, supra,* pp 137, 138, construed *People* v. *Hamilton, supra,* as forbidding a distinction between "confessions, admissions and statements, whether inculpatory or exculpatory."

Annotation, Impeachment of accused as witness by use of involuntary or not properly qualified confession, 89 ALR2d 478, 479.[8]  The decisions discussed in that annotation were decided prior to *Malloy* v. *Hogan* (1964), 378 US 1 (84 S Ct 1489, 12 L Ed 2d 653), which held the Fifth Amendment applies to the States via the Fourteenth Amendment, and Federal standards govern its application. See *In re Colacasides* (1967), 379 Mich 69, 84.

In 1925, the United States Supreme Court held that use of illegally seized, and therefore inadmissible, evidence [cocaine] to impeach the defendant was a violation of his Fifth Amendment right not to be compelled to incriminate himself.  On cross-examination the defendant had denied he ever had seen the seized narcotics.  The court ruled that the defendant "did nothing to waive his constitutional protection or to justify cross-examination in respect of the evidence claimed to have been obtained by the search."  *Agnello* v. *United States* (1925), 269 US 20, 35 (46 S Ct 4, 70 L Ed 145).

An exception to the exclusionary rule was recognized in *Walder* v. *United States* (1954), 347 US 62 (74 S Ct 354, 98 L Ed 503).  Defendant was on trial for illicit transactions in narcotics under a 1952 indictment.  He testified on direct examination, "I have never sold any narcotics to anyone in my life," and that he had never possessed narcotics.  The court held the introduction of evidence illegally seized in 1950 for impeachment permissible because "the defendant went beyond a mere denial of complicity in the crimes  *  *  *  and made the sweep-

---

[8] *Cf. Silverthorne Lumber Co.* v. *United States* (1920), 251 US 385, 392 (40 S Ct 182, 64 L Ed 319), where the Court observed: "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all."

ing claim that he had never dealt in or possessed any narcotics." (p 65)

The court emphasized that the 1950 illegal evidence did not relate to proof of defendant's guilt under the 1952 indictment and that it was in answer to a "sweeping claim" by defendant over and beyond the denial of the criminal elements:

"Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. *He must be free to deny all the elements of the case against him without thereby giving leave to the government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief.*" (p 65) (Emphasis supplied.)

The *Walder* exception has been consistently limited to impeachment concerning matters which do not bear on defendant's innocence or guilt, matters unrelated to the criminal elements under the indictment.[9]

The United States Court of Appeals for the District of Columbia recently summarized the post-*Walder* law:

"Since then [Walder], we have held that an inadmissible statement can be used only when the defendant makes 'sweeping claims that go far beyond the crime charged,' [*White* v. *United States* (1965), 121 App DC 287, 290 (349 F2d 965, 968)] is impeached on a statement relating to 'lawful proper acts' [*Tate* v. *United States* (1960), 109 App DC 13,

---

[9] See Kent, Miranda v. Arizona — The Use of Inadmissible Evidence for Impeachment Purposes, 18 Western Res L R 1177 (1967), for a review of cases following *Walder*. See, also, *People* v. *Davis* (1966), 241 Cal App 2d 51, 54 (50 Cal Rptr 215, 218), and *Commonwealth* v. *Wright* (1964), 415 Pa 55, 60 (202 A2d 79, 81). The people's brief directs us to *United States* v. *Curry* (CA 2, 1966), 358 F2d 904, but that case is not in point. The court there, following *Walder*, approved questioning defendant about prior statements *collateral* to the issue of guilt.

16 (283 F2d 377, 380)] 'collateral' to the issues be-
fore the jury [*Tate* v. *United States, supra,* p 17
(283 F2d, p 381)], or is questioned about 'minor
points.' [*Bailey* v. *United States* (1964), 117 App
DC 241, 242 (328 F2d 542, 543), *cert. denied* 377
US 972 (84 S Ct 1655; 12 L Ed 2d 741).] In such
situations, impeachment of the defendant affects
only his credibility, since the truth of the impeach-
ing statement does not itself tend to establish guilt.
[*Johnson* v. *United States* (1964), 120 App DC 69, 72
(344 F2d 163, 166).]" *Inge* v. *United States* (1966),
123 App DC 6 (356 F2d 345, 349).

The court in *Inge* disallowed the government's use
of defendant's prior statements to contradict his
trial testimony that deceased attacked him with a
knife, that he did not remember cutting the deceased,
and that he was injured in the fatal altercation.
That testimony bore directly on defendant's guilt.

*Walder* allows the defendant to deny all the ele-
ments of the crime and testify concerning any mat-
ter affecting his guilt without exposing himself to
the introduction of otherwise inadmissible state-
ments.

The impeachment question was noted in *Miranda,*
and that case may be read as a full ban on use of in-
admissible statements, in whole or in part, for any
purpose whatever, including impeachment. *Miran-
da* v. *Arizona, supra,* p 477.

That *Miranda* forbids use of any part of an illegal
statement for impeachment is the interpretation
adopted by the majorities in *State* v. *Brewton*
(1967), 247 Or 241 (422 P2d 581), *cert. den.* 387
US 943 (87 S Ct 2074, 18 L Ed 2d 1328) (1967);
*Groshart* v. *United States* (CA 9, 1968), 392 F2d 172,
and *Proctor* v. *United States* (CA DC, 1968), 404 F
2d 819, and unanimous courts in *Commonwealth* v.
*Padgett* (1968), 428 Pa 229 (237 A2d 209), and
*Wheeler* v. *United States* (CA 10, 1967), 382 F2d

998, a concurring judge in *Commonwealth* v. *Burkett* (1967), 211 Pa Super 299, 304 (235 A2d 161, 163), and two dissenters in *People* v. *Kulis* (1966), 18 NY2d 318, 324 (274 NYS2d 873, 876, 221 NE2d 541, 542). The *Burkett* and *Kulis* majorities followed the *Walder* rule.

In *State* v. *Brewton, supra,* the facts were identical to those in the instant case. The trial court had found statements given in 1957 "voluntary," in the sense that they were not coerced, but inadmissible because of failure to give the *Miranda* warnings. The Oregon Supreme Court ruled that the statements should not have been admitted for the purpose of impeaching the defendant's testimony at the time of his retrial subsequent to *Miranda.*

"While an argument can be made that 'voluntary' unconstitutional confessions can be distinguished from 'involuntary' unconstitutional confessions, solely for the purposes of impeachment, this dichotomy does not appeal to us as constitutionally meaningful. * * * we are satisfied that any attempt in the future to restrict the exclusionary rule to the state's case in chief would be inconsistent with the constitutional principles which are inherent in the *Miranda Case."* *State* v. *Brewton, supra,* p 582.

The *Brewton* court observed that a rule of law which would allow use of illegally obtained evidence for impeachment might encourage some charged with warning the defendant of his constitutional rights before interrogating him to take a "calculated risk":

"By giving up the possibility of using the suspect's statements in the state's case, they could obtain by unconstitutional means and store away evidence to use if the defendant should elect upon trial to take the stand. As commendable as it may be to prevent perjury, the price of such prevention could

be to keep defendants off the stand entirely. In some cases, the temptation to silence a suspect of dubious probity might very well outweigh the desire to conduct a constitutionally valid interrogation." *State* v. *Brewton, supra,* p 583. Similarly, see *Groshart* v. *United States, supra,* p 180.

We note the practical difficulties likely to be encountered in attempting to differentiate between defendant's "denial of the elements" and "sweeping claims." When a defendant takes the stand, completely responsive answers to all questions put to him on direct and cross-examination are likely to open up collateral matters. *Commonwealth* v. *Burkett, supra,* p 309; *State* v. *Brewton, supra,* p 583; *Groshart* v. *United States, supra,* p 179.

Here the trial court argued the necessity of using the inadmissible statements for impeachment to prevent defendant's perjury and test his credibility. The defendant is no freer to perjure himself than any other witness; if he does, he subjects himself to prosecution for perjury. The defendant, like any witness, may be impeached.[10] "The State should be free to impeach, but it ought to come by its impeachment as legally as it accumulates its other evidence." *State* v. *Brewton, supra,* p 583.

To refer to a statement as "inadmissible" but "voluntary" is contrary to the core of *Miranda.* The greater part of the majority opinion concerned itself with the atmosphere of compulsion found to be *inherent* in custodial interrogation. *Miranda* v. *Arizona, supra,* pp 445–469.

---

[10] The general rule is that a witness may *not* be impeached concerning collateral matters, but only as to matters relevant to the issue at trial. 58 Am Jur, Witnesses, § 783; 98 CJS, Witnesses, § 580, p 551; *Gilchrist* v. *Gilchrist* (1952), 333 Mich 275; *People* v. *McLean* (1888), 71 Mich 309. Denial by a witness is generally regarded as conclusive where the alleged statement relates to a collateral matter. 98 CJS, Witnesses, § 611, p 613; McCormick on Evidence, § 36, p 66; *People* v. *McLean, supra.*

The question whether a defendant's inadmissible statements can be used to impeach his trial testimony has not before arisen in Michigan. Adoption of either the *Brewton* rule of complete exclusion of inadmissible statements for any purpose or the *Agnello* rule of exclusion with its limited exception approved in *Walder* would forbid the use of Marsh's statements, since they bore directly on the issue facing the jury.

Marsh testified at the 1966 trial that he did not intend to kill the deceased and did not go to deceased's apartment intending to rob him, that robbery was an afterthought. The prosecution countered by asking defendant about his alleged statement to the policemen transporting him to Michigan that he went to deceased's apartment to "get even" with him and that he intended to rob Chaloner's store and the deceased. It also called and questioned former trooper Seymour about the statements. This and the question concerning the inadmissible written statement to the prosecutor were error. The intention to rob or premeditated intention to kill, once established, would support a conviction of first degree murder.

Without unnecessarily deciding which theory of exclusion, the *Walder* or *Brewton* approach, should be adopted, we decide that under either *Brewton* or *Walder* the statements, and any reference thereto, were inadmissible.

We add that on principle the people should not be allowed to have admitted against a defendant who takes the stand evidence that would be inadmissible if he exercised his constitutional right to refrain from taking the stand. A contrary rule would unconstitutionally chill exercise of either the constitutional right to have improper evidence suppressed or the constitutional right to take the stand.

*Groshart* v. *United States, supra,* p 180.  Cf.
*Simmons* v. *United States* (1968), 390 US 377 (88
S Ct 967, 19 L Ed 2d 1247) ; *People* v. *Luna* (1967),
37 Ill 2d 299 (226 NE2d 586) ; *Safarik* v. *United
States* (CA 8, 1933), 62 F2d 892, 897 ; *Johnson*
v. *United States, supra; Garrity* v. *New Jersey*
(1967), 385 US 493 (87 S Ct 616, 17 L Ed 2d 562) ;
and *Spevack* v. *Klein* (1967), 385 US 511 (87 S. Ct
625, 17 L Ed 2d 574).

"We find it intolerable that one constitutional
right should have to be surrendered in order to
assert another." *Simmons* v. *United States, supra,*
p 394.

### III.

In final argument to the jury the prosecutor re-
ferred to Marsh's former statements :

"Ladies and gentlemen, he told a story in Pennsyl-
vania.  He told a story to the police officers on the
way back from Pennsylvania.

"He told a story to the assistant prosecutor, Mr.
Michener.  He told a story to Judge Rathbun
twenty-five years ago.

"He's had his chance to tell his story before."

The circuit judge found this argument proper re-
buttal of defense counsel's and defendant's asser-
tions that defendant "never had a chance to tell
his story."  The final argument's reference to inad-
missible statements for the purpose of rebutting
the assertion that Marsh never before had a chance
to tell his story was, of itself, improper.[11]

---

[11] In a similar situation, *White* v. *United States* (1965), 121 App
DC 287 (349 F2d 965, 967), the court held it error to introduce an
inadmissible statement for impeaching defendant's assertion that
implied to the jury he would have told the police of his claim of
self-defense when first arrested if allowed to speak.  *Walder,* said the
*White* court, "does not authorize the use of inadmissible evidence to
contradict such remote inferences."

Marsh's case well illustrates that "mere mention" of a confession's existence may not only be as harmful as admission of the confession itself, but also that it may be more harmful than admission of the statement and its attendant circumstances *in toto*. Cf. *People* v. *Frechette* (1968), 380 Mich· 64, 71. On the whole, Marsh's written statement to the prosecutor supports his theory rather than the people's. Nowhere in that statement did Marsh say he planned either to kill or rob the victim.

The following is from the 1941 written statement:

"*Q.* [by the prosecuting attorney]  Did you have an argument with him [Berger] while you were there [in his apartment]?

"*A.* [by Marsh] Yes, sir.

"*Q.* What ·was the nature of the argument?

"*A.* He had been telling around that I was stealing from the store and I wasn't.  *  *  *

"*Q.* What did you go to the apartment of Herman Berger for?

"*A.* To argue it out with him.  I didn't go up to kill him or anything like that."

[The confession contains no contrary concession on the part of the defendant.]

The term "confession" implies to the jurors' ears that the defendant has admitted guilt of every element charged by the people.[12]  In fact, Marsh's "confession" admits no more than he himself admitted at trial, that he caused Berger's death.

## IV.

The people argue that Marsh "opened the door" to the receipt of the inadmissible statements when

---

[12] In *Gaertner* v. *State* (1967), 35 Wis 2d 159, 174 (150 NW 2d 370, 378), the statement's contents were not disclosed, but only the fact of its existence.  The court saw "no distinction between telling the jury the fact of the existence of a confession and disclosing its details."

he took the stand and denied his guilt. For reasons already stated, that argument is constitutionally untenable. Its adoption would force a defendant to choose between exercising his constitutional right to take the stand and defend himself and his constitutional right to have illegal evidence suppressed, making exercise of one right the destroyer of another.[13]

"There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price." *Garrity* v. *New Jersey, supra,* p 500.

The people also claim that questions put by Marsh's counsel to him "opened the door" to the introduction of the inadmissible statements. The claim that a federally guaranteed constitutional right has been waived presents a question controlled by Federal law. *Brookhart* v. *Janis* (1966), 384 US 1, 4 (86 S Ct 1245, 16 L Ed 2d 314).

There are some mistakes which no man can make for another. He confuses standards governing fundamental constitutional rights for statutory or common law rules who makes much of the argument that defense counsel "opened the door."[14]

In a number of cases the United States Supreme Court has declared that a constitutionally-protected right is not a superficiality which may be waived by silence or inadvertence; the high standards of waiver set out in *Johnson* v. *Zerbst* (1938), 304 US 458, 464 (58 S Ct 1019, 1023, 82 L Ed 1461, 1466), have never been abandoned.[15]

---

[13] See authorities cited in concluding paragraph of part II.

[14] Cf *Gouled* v. *United States* (1921), 255 US 298, 313 (41 S Ct 261, 266, 65 L Ed 647, 654), where the court observed: "A rule of practice must not be allowed for any technical reason to prevail over a constitutional right."

[15] *Miranda* v. *Arizona, supra,* p 475; *Smith* v. *United States* (1948), 337 US 137, 150 (69 S Ct 1000, 93 L Ed 1264, 1274); *Fay* v. *Noia* (1963), 372 US 391, 439 (83 S Ct 822, 849, 9 L Ed 2d 837, 869);

"It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege."

Particularly apposite is *Poe* v. *United States* (D DC, 1964), 233 F Supp 173, affirmed *United States* v. *Poe* (1965), 122 App DC 163 (352 F2d 639), where the court held a defendant was entitled to a new trial where he elected not to take the stand on the basis of erroneous legal advice from his lawyer. His lawyer had, in apparent ignorance of the *Walder* line of cases, advised the defendant that the prosecution could use an otherwise inadmissible confession should the defendant testify. The court observed (p 176):

"The right to testify is personal to the accused. He must make the ultimate decision on whether or not to take the stand. In this regard it is unlike other decisions, which are often called 'trial decisions,' where it is counsel who decides whether to cross-examine a particular witness or introduce a particular document. Here it is the accused who must decide and it is the duty of counsel to present to him the relevant information on which he may make an intelligent decision."

It was of great importance to Marsh to exclude, if possible, any reference to the 1941 written and oral statements. With that in mind we do not think

---

*Escobedo* v. *Illinois* (1964), 378 US 478, 490 (84 S Ct 1758, 1765, 12 L Ed 2d 977, 986); *Brookhart* v. *Janis, supra; In re Gault* (1967), 387 US 1, 42 (87 S Ct 1428, 18 L Ed 2d 527, 554).

"But a valid waiver will not be presumed simply from the silence of the accused." *Miranda* v. *Arizona, supra*, p 475. "Presuming waiver from a silent record is impermissible." *Carnley* v. *Cochran* (1962), 369 US 506, 516 (82 S Ct 884, 8 L Ed 2d 70, 77).

Marsh relinquished or abandoned his right to exclude those statements as inadmissible when he answered his lawyer's question: "Now, have you ever stated * * *?" Marsh was not required to object to his own lawyer's question in order to preserve his constitutional right to exclusion of the confession.[16]

If, as we have held, an inadmissible confession may not be used to impeach a defendant's denial of guilt, it would be anomalous to allow the confession to be used to impeach the defendant's denial that he gave a confessional statement. To put it differently, if the defendant does not by denying guilt "open the door" to use of a confessional statement, then he does not open the door to its use by denying that he gave such a statement. Since proof that the defendant had given a statement would tend to prove his guilt of the crime charged (*People* v. *Frechette, supra,* and *Gaertner* v. *State* [1967], 35 Wis 2d 159 [150 NW2d 370, 378]), such proof was inadmissible under the *Walder* exception even if such proof did not include, as was here allowed, proof of the contents of the statement.

The defendant's denial that he had given a statement admitting guilt would have been of importance only if the statement was admissible. Where, as here, the statement was itself inadmissible, the defendant's denial that he had given a statement negatived nothing and carried little probative or persuasive value. The defendant's denial had mini-

---

[16] "It is elementary that the constitutional right of an accused person to a fair and impartial trial according to the law and evidence should not be frittered away or destroyed because of the neglect of counsel." *State* v. *Moore* (1952), 194 Or 232, 238 (241 P2d 455, 458). Cf. *Brown* v. *Mississippi* (1936), 297 US 278, 287 (56 S Ct 461, 465, 80 L Ed 682, 687). See, also, *United States* v. *Stoehr* (MD Pa, 1951), 100 F Supp 143, 152. See the Court's observations concerning the inattentiveness of counsel in *Prudential Insurance Company* v. *Cusick* (1963), 369 Mich 269, 289.

mal impact and did not justify or require out of fairness to the people that the confessional statement otherwise inadmissible be then admitted.

We find no need to comment on the other claims of error.

Reversed and remanded for a new trial.

T. G. Kavanagh, P. J., concurred with Levin, J.

Sullivan, J. (*dissenting*). In 1941 the defendant, Fred Marsh, killed Herman Berger. The decedent was slain in his own apartment after the defendant beat, attempted to strangle, and finally killed him by jamming a ruler down his throat. At the time of the killing, Berger was a 69-year-old man of slight stature (5′ 7″, 135 pounds). Marsh was 22 years old.

The defendant fled after the crime, was apprehended in Pennsylvania and returned to Michigan for trial. He pleaded guilty and the court found, after taking proofs, that the crime was first degree murder and sentenced defendant to life in prison.

After serving 22 years in prison the defendant was paroled on May 20, 1963. While still on parole he was arrested and convicted of gross indecency (May 12, 1965) and sentenced to prison for 4–1/2 to 5 years. He was returned to prison to serve that sentence and also as a parole violator. Subsequently on April 11, 1966, he sought and obtained a new trial on the murder conviction, and it is for alleged errors in the new trial (held in August, 1966) that he brings this appeal.

There are several grounds urged as the basis for a new trial, but the court, I believe, sees no substance to any of them except the alleged improper use of defendant's statements given by the defendant to law enforcement authorities after his

arrest. These statements had been suppressed as evidence before the 1966 trial on motion of defendant.

In order to put the prosecutor's questions in perspective it is important to review briefly what defendant's theory of the case is and what defendant and his counsel said at the trial.

In his opening statement to the jury, defendant's attorney, though disclaiming any theory of self-defense admitted that defendant killed the decedent "during a struggle" by "passing a ruler across his (decedent's) mouth" in order to shut the decedent up. (The proofs showed that 11 inches of a 12-inch ruler had been jammed down decedent's throat severing a nerve and causing his death.)

However, when the defendant testified in his own behalf he said he "honestly believed" that he did not kill the decedent; that on a number of occasions he denied having killed decedent; but that he had had "a fracas" with him. As noted above in the court's opinion, it was on direct examination that defendant was first asked about statements or admissions:

"*Q*. Now, have you ever stated, admitted anything of the sort that you intended to rob Chaloner's store or to rob Mr. Berger?

"*A*. No, sir, I never made such a statement."

This was the first reference in the trial to statements or admissions by the defendant. Evidently feeling that the "door had been opened" (cf. *Walder, infra*), the prosecutor on cross-examination asked defendant:

"*Q*. Didn't you tell the police in Pennsylvania that you were going, that the reason you went up to that apartment that night was to get even with Mr. Berger?

"*A*. No, sir.

"*Q.* Square up with him?

\* \* \*

"*Q.* Didn't you tell the police in Pennsylvania that?

"*A.* Yes, I did. I was subject to saying that at the time.

"*Q.* They weren't beating you or anything like that?

"*A.* No, sir.

"*Q.* They treated you good down there, didn't they?

"*A.* Yes, sir.

"*Q.* You told the police in Pennsylvania then that Mr. Berger told you several times not to come into the store and he accused you of stealing from the store and that you went up to his apartment to get even with him. Is that right?

"*A.* I do not recall making such a statement.

"*Q.* Well, let's break it up, piecemeal. Do you remember telling the police in Pennsylvania that Herman Berger told you not to come into the store and accused you of stealing?

"*A.* I do not recall making such a statement.

"*Q.* Do you recall telling the police you went to his store to get even with him?

"*A.* No, sir.

"*Q.* You don't recall telling them that in Pennsylvania?

"*A.* No, sir.

"*Q.* Do you recall when Commissioner Arch Wilson and Trooper George Seymour came down to see you, pick you up and bring you back?

"*A.* Yes, sir.

\* \* \*

"*Q.* Now, when they came to pick you up they were good to you, weren't they?

"*A.* Yes, sir.

"*Q.* They didn't beat you or anything like that?

"*A.* No, sir.

"*Q.* Do you remember telling them on the way back that you wanted some money and that you de-

cided to go to Herman Berger's apartment and rob him to get the keys to get out?

\*          \*          \*

"*A*. It was, well, sir, we had so much conversation I just don't remember all of it."

There is no claim that the statements alluded to were obtained by force or promises. The claimed error arises from the mere use of such statements to attempt impeachment of the defendant, and not, of course, to use such statements as affirmative evidence to establish the crime.

The statements, orally made to arresting officers and in writing to the prosecutor, were given by defendant in 1941. Since the *"Miranda* warning" (enunciated in June, 1966)[1] was not given, the statements were suppressed on the retrial, though whether they should have been is at least open to question.

Admittedly there is no precedent for this court to follow in our own state court reports. The majority of the court cites and relies upon two "rules": The *Brewton*[2] rule and the *Walder*[3] rule. The majority finds both rules violated by the state in this case through use of the statements for impeachment.

*Brewton,* as the majority notes, permits no use whatsoever of suppressed prior contradictory statements.

The *Brewton Case,* of course, is not binding on this court. There are sound reasons why it should not become a precedent in this state and they are best

---

[1] *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694).

[2] *State* v. *Brewton* (1967), 247 Or 241 (422 P2d 581).

[3] *Walder* v. *United States* (1954), 347 US 62 (74 S Ct 354, 98 L Ed 503).

summarized in the dissent of three of the seven justices in that case:

"Perry, Justice (*dissenting*).

"I am of the opinion that neither *Miranda* v. *Arizona* (1966), 384 US 436, (86 S Ct 1602; 16 L Ed 2d 694), nor any of the opinions of this court, compel the reasoning or result approved by the majority in this case.

"*Miranda* v. *Arizona, supra,* and *State* v. *Neely* (1965), 239 Or 487, (395 P 2d 557; 398 P 2d 482), deal with the use of confessions for the purpose of providing probative facts required to establish the necessary elements of the crime with which a defendant is charged. These cases are thus grounded upon the proposition set forth in the Fifth Amendment of the Constitution of the United States—that no man shall be compelled to give incriminating evidence against himself.

"Incriminating evidence is evidence which tends to show that the defendant did certain acts from which a trier of fact could conclude that the defendant committed the crime charged. The purpose of the prophylactic rule of exclusion is to prevent the introduction of statements made by a defendant which tend to establish his guilty acts as matters of fact.

"The introduction of statements made by a defendant by way of impeachment to test the credibility of his story of his innocence serves no such purpose.

"A defendant's statements and his confession thus used have no probative value to prove the crime charged, and the trial court will so instruct the jury.

"The trial judge, after an extensive hearing, held that the confession of this defendant was voluntary, but that it could not be used as probative evidence because it violated the absolutism rules of procedure laid down by a majority of the Supreme Court of the United States to curb what they believed were unwarranted police practices.

"*State* v. *Smith,* 242 Or 223, (408 P 2d 942), permits the introduction of statements for impeachment purposes if found voluntary.

"In *Walder* v. *United States* (1954), 347 US 62, 65 (74 S Ct 354, 98 L Ed 503), in dealing with an exclusionary rule that prevented the introduction of evidence as proof of the crime charged, the Supreme Court stated:

" 'It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.   *   *   *'

"I know of no reason why this court should go beyond the requirements of the Supreme Court of the United States in announcing a rule that would enlarge the exclusionary rules of the Supreme Court to a point not compatible with the purposes sought to be served by the Fifth Amendment.

"Based upon the rationale of *Walder* v. *United States, supra,* followed in *Tate* v. *United States* (1960), 109 App DC 13, (283 F2d 377), and *State* v. *McClung* (1965), 66 Wash 2d 654, (404 P2d 460), I would affirm the judgment.

"Holman, Justice (*dissenting*).

"The issue is whether the prophylactic purposes of *Escobedo*[4] and *Neely*[5] will be negated if admissions and confessions obtained by non-compliance with those cases are permitted to be used for impeachment of defendants. I am of the opinion that the inability of the prosecution to use such admissions and confessions in its case in chief for incriminating purposes will be sufficient to obtain compliance with *Escobedo* and *Neely* requirements by the police. If this is so there is no valid reason for

---

[4] *Escobedo* v. *Illinois* (1964), 378 US 478 (84 S Ct 1758; 12 L Ed 2d 977).

[5] *State* v. *Neely* (1965), 239 Or 487 (395 P2d 557; 398 P2d 482).

not permitting the use for impeachment purposes of evidence that everyone concedes is both relevant and truthful."

The *Walder* rule seems to be gleaned not so much from what Justice Frankfurter, the author of *Walder,* said, but from the *post-Walder* cases which interpret what he said.[6]

This court is still free to read *Walder* and interpret it for itself, and it may well be that the misinterpretation of *Agnello*[7] which gave rise to *Walder* has now attached to *Walder.*

Set out below is what I consider the essence of the *Walder Case:*

"The question which divided the court, and the sole issue here, is whether the defendant's assertion on direct examination that he had never possessed any narcotics opened the door, solely for the purpose of attacking the defendant's credibility, to evidence of the heroin unlawfully seized in connection with the earlier proceeding.  Because this question presents a novel aspect of the scope of the doctrine of *Weeks* v. *United States,* 232 US 383, [34 S Ct 341, 58 L Ed 652], we granted certiorari.  345 US 992, [73 S Ct 1144, 97 L Ed 1399].

"The government cannot violate the Fourth Amendment—in the only way in which the Government can do anything, namely through its agents— and use the fruits of such unlawful conduct to secure a conviction.  *Weeks* v. *United States, supra.*  Nor can the Government make indirect use of such evidence for its case, *Silverthorne Lumber Co.* v. *United States,* 251 US 385, [40 S Ct 182, 64 L Ed 319], or support a conviction on evidence obtained through leads from the unlawfully obtained evidence, *cf.*

---

[6] *E.g. Inge* v. *United States* (1966), 123 App DC 6 (356 F2d 345); *United States* v. *Curry* (CA 2, 1966), 358 F2d 904.

[7] *Agnello* v. *United States* (1925), 269 US 20 (46 S Ct 4, 70 L Ed 145).

*Nardone* v. *United States,* 308 US 338, [60 S Ct 266, 84 L Ed 307]. All these methods are outlawed, and convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men.

"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment." pp 64, 65.

I believe the above language enunciates the rule of law found in *Walder.* Following this language the court uttered the "mere denial" and "sweeping claim" dictum—not as a rule of law, as *Inge* and others would have us believe—but merely as an illustration of the aggravated circumstances of the case. The court said:

"Take the present situation. Of his own accord, the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics. Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to *introduce by way of rebuttal evidence* illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.

"The situation here involved is to be sharply contrasted with that presented by *Agnello* v. *United States,* 269 US 20 (46 S Ct 4, 70 L Ed 145). There

the Government, after having failed in its efforts to introduce the tainted evidence in its case in chief, tried to smuggle it in on cross-examination by asking the accused the broad question "Did you ever see narcotics before?" After eliciting the expected denial, it sought to introduce evidence of narcotics located in the defendant's home by means of an unlawful search and seizure, in order to discredit the defendant. In holding that the Government could no more work in this evidence on cross-examination than it could in its case in chief, the Court foreshadowed, perhaps unwittingly, the result we reach today:

" 'And the contention that the evidence of the search and seizure was admissible in rebuttal is without merit. *In his direct examination, Agnello was not asked and did not testify concerning the can of cocaine.* In cross-examination, in answer to a question permitted over his objection, he said he had never seen it. He did nothing to waive his constitutional protection or to justify cross-examination in respect of the evidence claimed to have been obtained by the search. *   *   *'   269 US 20, 35.

"The judgment is affirmed." pp 65, 66. (Emphasis supplied.)

In my view, even the strictest construction of *Walder* in no way precludes alluding to statements made by defendant in this case, particularly in view of his testimony given on direct examination. If the "sweeping claim" test is the norm, then insofar as such a norm is comprehensible, the defendant here meets it.

As to the rebuttal testimony of Trooper Seymour, he simply testified that the defendant had made statements to him while returning from Pennsylvania, *viz:* that decedent would not allow defendant in the store; that decedent called defendant a thief; and that he had gone to decedent's apartment to get the keys to Chaloner's store so he could get

money. None of this testimony was inadmissible because of *Walder,* nor did such testimony establish elements of the crime. As the trial court pointed out to the jury before such proofs were received, the testimony was "simply to assist you in weighing the credibility of the defendant as a witness."

Given the facts in this case, the option of adopting or rejecting cases like *Brewton,* and the certainty that there is no "federal standard" case squarely in point (including *Walder*), what compulsion is there for setting aside this conviction and adopting such a rule of law? Certainly it is not a thirst for justice.

Notwithstanding the facts above, the court today has undone the defendant's conviction and for the third time afforded him a trial because the defendant was cross-examined by the prosecutor (not yet of itself considered an invasion of the rights of the accused) from statements he freely and voluntarily gave to arresting officers and the prosecutor some 25 years before *Miranda.*

There is nothing in the fifth amendment that gives the defendant in a criminal case the right to lie with impunity.[8] He cannot, of course, be forced to take the stand, but once he does he ought to be subject to cross-examination as any other witness. If he has uttered prior contradictory statements, why shouldn't the jury know this in evaluating his credibility—unless of course such statements have been obtained by threat or promise and for that very reason lacking in trustworthiness? (*e.g. Brown* v. *Mississippi* [1936], 297 US 278 [56 S Ct 461, 80 L Ed 682]).

---

[8] This Court's suggested cure, prosecution for perjury, somehow doesn't sound like a deterrent for a man facing a mandatory life sentence.

Courts of this country have been charged with going to unbelievable lengths in showing concern for the accused and a concomitant indifference for the victim. At times it must seem that conviction itself is *prima facie* evidence of "error" in the trial. Courts have been caught up in a fascinating game played with the criminal law where the guilt or innocence of the accused is almost irrelevant. Justice Cardozo's famous dictum of yesteryear is today's legal heresy, as judges continue to flay the blundering constable by freeing the felon.[9] Without question recent decisions have had a certain therapeutic value in police and prosecution practices and eliminated some inequities in the criminal law. But in the meantime the crime picture across the country darkens, and society wonders if a balance will ever be struck between the rights of the accused and the rights of the community. There is something almost suicidal in the headlong drive to use the courtroom primarily as a forum to train law enforcement officers in next year's rules of criminal procedure and only incidentally to ascertain guilt or innocence of the accused. Ordered society as we have known it may not be around to reap the fruits of the experiment.

Criminal law cannot be equated with an athletic contest where it matters not who wins or loses but "how you play the game." The function of criminal court proceedings historically has been a search for truth and justice—an honest endeavor to find out if the accused is guilty or innocent. Law enforcement officers today have a most difficult burden of trying to keep abreast of the U. S. Supreme Court's actual decisions. On top of these there are piled erudite "interpretations" and artfully

---

[9] Cf., Cardozo, *People v. DeFore* (1926), 242 NY 13, 21 (150 NE 585, 587).

drawn "logical extensions" of these decisions in most self-respecting law journals and many "forward looking" appellate courts. Professors, heretofore occupied with more esoteric aspects of the law, have, in remarkably short time, become experts in the field of criminal law without ever leaving the campus. Trial and appellate courts vie with one another to be the first (on their block) to get where they feel the Supreme Court is going.

In the meantime the bewildered, angry populace braces itself against a rising tide of crime, and in utter frustration denounces the judiciary for what it considers a fatal fascination for experimenting with the criminal law. Editorial writers bemoan the frightening crime statistics and wonder why the courts are insensitive to it all. The trial courts of our largest city announce a moratorium on civil cases to devote all their man power to the burgeoning criminal docket (made up in no small part of cases being tried for the second or third time). Humanitarianism is not something that only the accused may invoke. There ought to be a limit, for example, to the number of times an assault or rape victim is required to appear in court and recount the details of her trauma.

I cannot for the life of me see the justice in subjecting the defendant to a partial cross-examination, or compelling the state, in the interest of a "fair trial", to refrain from asking the accused embarrassing questions about the crime. Until we are compelled by clear and unmistakable precedent to do so, I would hold such use of prior contradictory statements permissible. I would affirm the conviction.