*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

TYRILL LAMONT WADE,

Defendant-Appellant.

FOR PUBLICATION
July 08, 2025
10:50 AM

No. 369106
Saginaw Circuit Court
LC No. 22-049929-FC

Before: O'BRIEN, P.J., and M. J. KELLY and KOROBKIN, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of second-degree murder, MCL 750.317, and possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant's convictions arose from the shooting death of Taylor Poling on December 7, 2010, but defendant was not charged in the instant case until 2021. The trial court sentenced defendant to 39 to 65 years' imprisonment for second-degree murder, consecutive to two years' imprisonment for felony-firearm, with no credit for time served because, when defendant was arrested in this matter, he was on parole for a different offense that he committed in 2011. On appeal, defendant raises a number of evidentiary and constitutional arguments, none of which have merit. He also argues that his felony-firearm conviction was barred by the statute of limitations, and that he was entitled to jail credit because he was not on parole when Taylor was murdered. These latter arguments have merit. Because felony-firearm is a distinct offense without a specified limitations period, the catchall six-year statute of limitations for criminal indictments in MCL 767.24(10) applies. By the time that defendant was prosecuted in 2021, the statute of limitations had run on the felony-firearm offense he committed in 2010. That charge must therefore be dismissed. Concerning whether defendant was entitled to jail credit, the prosecution concedes that defendant was not on parole when Taylor was murdered, so his parole status should not have precluded him from receiving any jail credit to which he was entitled. We accordingly affirm defendant's second-degree-murder conviction, but we vacate defendant's felony-firearm conviction, and remand for the trial court to dismiss that conviction, provide defendant with an opportunity to establish any jail credit to which he is entitled, and correct his judgment of sentence accordingly.

# I. BACKGROUND

Troy Marie Poling, Taylor's mother, testified that Taylor moved out of Troy's home in September 2010 and got an apartment. Troy knew that Taylor was dating someone before she moved out, but did not learn that that someone was defendant until October 2010. In November 2010, Troy began noticing bruises on Taylor's forearms that "looked like fingerprints, but [Taylor] said she fell off her bike" when asked about the bruises.

Terry Wade, defendant's brother, testified that defendant called him on December 7, 2010, and asked him to come to Taylor's apartment to take her to a doctor. Terry rushed over to Taylor's apartment and ran inside, where he found Taylor lying on the floor, and defendant trying to pick her up and screaming that Taylor needed a doctor. Terry saw blood on the floor and on Taylor's head, and he called 911. Records showed that the call was placed at 7:47 p.m.

One officer was nearby, and he arrived at the scene within minutes. Upon arrival at Taylor's apartment, the officer observed defendant and Terry inside the apartment, and found Taylor on the ground just inside the door between the kitchen and the next room. The officer saw blood on Taylor, a pool of blood on the ground next to Taylor, and blood on the couch in Taylor's apartment. While the amount of blood made it difficult for the officer to see the cause of Taylor's injury when he first arrived, it was later determined that Taylor had been shot in the head, and she was taken to the hospital.

Saginaw Police Detective Timothy Fink[1] was assigned to the case at approximately 8:30 p.m. on December 7, 2010. By the time he arrived at Taylor's apartment, Taylor had been taken to the hospital. Fink entered Taylor's apartment through the back door, which led into a foyer and storage area, then into a carpeted living room. A couch was further into the living room past a chair. Fink observed a pool of blood "at the edge of the foyer in the living room" and blood splatter or blood marks on the left and right couch cushions, but did not observe "much blood" on the middle cushion. An expert in bloodstain-pattern analysis testified at defendant's trial that the bloodstain pattern on the couch suggested that Taylor was on the couch when she was shot, and the absence of a pool of blood on the couch suggested that she was moved to her location on the floor very quickly after being shot. Fink saw no signs of forced entry. Fink left further examination of Taylor's apartment to the forensic team and went to the hospital, where he learned that Taylor had been pronounced dead at approximately 10:00 p.m.

Dr. Kanu Virani, M.D.—who was qualified as an expert in forensic pathology—performed an autopsy on Taylor, which Fink attended. Both Virani and Fink observed multiple bruises on Taylor's body in various stages of healing. Virani determined that the cause of Taylor's death was a gunshot wound to her head. The bullet was recovered by the emergency-room doctors, and it was later identified as a .38 caliber bullet of a type typically used in revolvers.

---

[1] By the time of defendant's trial, Fink's position had changed. To reflect the facts as they stood when the relevant events took place, this opinion refers to all witnesses by the rank, position, and name that they had during the events about which they testified.

Fink interviewed defendant at 2:00 a.m. on December 8, 2010. Defendant told Fink that he had asked Taylor to marry him two days before the shooting. He also told Fink that he spent the night with Taylor before the shooting, and she left for school the following morning at 7:00 a.m. According to Fink, defendant said that he and Taylor then communicated throughout the day, and the communications concerned issues that Taylor was having with an ex-boyfriend, Darrian Owens. Owens was initially considered a suspect, but police ruled him out after they determined that he had been at home on December 7.

Texts exchanged between defendant and Taylor on the day of the shooting referenced a gun. In the texts, Taylor asked defendant to "bring a gun for me," which she apparently wanted so she could "shoot Darrian [sic] house up." Defendant did not volunteer any information about these texts to Fink, and, according to Fink, when he confronted defendant about the texts, defendant first said he forgot about them and then "said he thought it wasn't a big deal."

Cellphone records showed that between 5:44 p.m. and 5:59 p.m. on December 7, defendant and Taylor communicated several times, including four phone calls. Defendant told Fink that he left his cousin's house about an hour after the 5:59 p.m. call and went to Taylor's apartment. When he arrived, Taylor's door was ajar, and defendant walked in to see Taylor on the floor, bleeding. Defendant told Fink that he shook Taylor and tried to get her to respond, and Taylor gasped for air several times. Defendant said that he checked for intruders then called Terry, who called 911. Defendant's phone records showed that his phone had no communication activity between 5:59 and 7:30 p.m., and then he made a call at 7:30 p.m.

Before defendant's trial, the prosecution filed notice that it intended to introduce other-acts evidence under MRE 404(b) and MCL 768.27b that defendant committed domestic violence against his former girlfriend, Megan Schweinsberg. The trial court allowed the evidence over defendant's objection.

At defendant's trial, Schweinsberg testified that she and defendant had been "boyfriend-girlfriend" for four or five years by December 2010, and the relationship ended in 2011. Schweinsberg described her relationship with defendant as bad, abusive, manipulative, and controlling. She said that defendant beat her on numerous occasions, required her to be under constant supervision, and forbade her from calling anyone or going anywhere.

Schweinsberg testified that defendant's abuse included striking her with a .38 revolver a "few times," and that he kept the revolver under his mattress. Schweinsberg said that, along with the .38 revolver, she had seen defendant with a .22 pistol and a shotgun, and that defendant used the shotgun to shoot batteries at Schweinsberg. After Taylor was killed, Schweinsberg never saw defendant's .38 revolver again. She recalled, however, one occasion in which defendant came home "in a rage" and threatened to kill or beat an individual "because he [kept] talking about a gun that was buried."

Schweinsberg did not know Taylor, but she suspected that defendant was seeing other women, and she eventually found out that Taylor was one of those women. After Taylor was killed, defendant, according to Schweinsberg, became "frantic" and "was constantly washing his hands with bleach, asking [Schweinsberg] questions about—to try to figure out how to pass a polygraph test," and "was worked up a lot." Schweinsberg also recalled one occasion when

defendant "was on top of [her] punching [her] and kicking [her], he told [her] that he should have killed [her] instead."

Detective Trooper Robert Scott testified at defendant's trial that on November 14, 2014, he interviewed defendant's then-girlfriend Unique Horn, who had since passed away. According to Scott, Horn agreed to wear a recording device during a conversation with defendant. Scott explained that Horn did so voluntarily and was under no obligation to do so. During the recorded conversation, defendant asked Horn if she was cheating on him, and when she said no, he called her a liar and became, in Scott's words, "very threatening and intimidating." Scott testified that defendant's threats included telling Horn "that if he found out that she was cheating on him, he would F her over and the guy that she was F'ing with, and then he made the statement that Taylor would have told you that and you should know that." The recording was played for the jury but not transcribed. Scott did not say so at trial, but defendant was incarcerated at the time of the recorded conversation with Horn.

Defendant was charged with Taylor's murder in September 2021, and he was convicted and sentenced as detailed above. This appeal followed.

II. FELONY-FIREARM

Defendant first argues that his felony-firearm conviction should be vacated because the statute of limitations had expired by the time he was charged with that offense. We agree.

As with most issues, to preserve his statute-of-limitations argument for appeal, defendant had to raise the argument in the trial court. See *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012). Even in criminal cases, a statute-of-limitations defense is waivable, *People v Burns*, 250 Mich App 436, 439-440; 647 NW2d 515 (2002), and if defendant waived the issue, then appellate review is unavailable, *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). See also *People v Everard*, 225 Mich App 455, 461-462; 571 NW2d 536 (1997). Waiver is the intentional relinquishment of a known right. *People v Carines*, 460 Mich 750, 763 n 7; 597 NW2d 130 (1999). It differs from forfeiture, which is merely the failure to timely assert a right. *Carter*, 462 Mich at 215. While defendant did not raise his statute-of-limitations argument before the trial court, he also did not intentionally relinquish a known right; his failure to raise the issue qualified as mere forfeiture. See *id*. at 215-216. This issue is therefore subject to the standard that applies to unpreserved issues—plain error. *People v Flores*, 346 Mich App 602, 608-609; 13 NW3d 668 (2023).

To be entitled to relief under plain-error review, the defendant must show that (1) an error occurred; (2) the error was plain, meaning that it "is not subject to reasonable dispute"; and (3) the error affected his substantial rights, meaning that it "affected the outcome of the lower court proceedings." *People v Allen*, 507 Mich 597, 613-614; 968 NW2d 532 (2021) (quotation marks and citations omitted).

Taylor was killed on December 7, 2010, and the felony complaint in this case was filed more than 10 years later on September 1, 2021. MCL 767.24 specifies the time frames in which

indictments must be filed.[2]  The statute explicitly provides the time for filing indictments for certain enumerated crimes.  For instance, it provides that an indictment for murder may be filed at any time, MCL 767.24(1)(a), and that an indictment for mortgage fraud must be filed within 10 years, MCL 767.24(9).  But MCL 767.24 does not specify the time frame for filing an indictment for every crime, which is where the catchall provision in MCL 767.24(10) comes in.  That subsection provides, "All other indictments may be found and filed within 6 years after the offense is committed."  MCL 767.24(10).  Felony-firearm is not among the crimes or statutes expressly identified in MCL 767.24, so the six-year default limitations period should logically apply to it.

The prosecution contends that felony-firearm should not be subject to its own limitations period but should be subject to the same limitations period as the predicate felony.  We reject this argument because, while charging an individual with felony-firearm depends on the existence of a predicate felony or attempted felony, felony-firearm is a crime distinct from the underlying felony or attempted felony.  "The felony-firearm statute applies whenever a person carries or has a firearm in his possession when committing or attempting to commit a felony."  *People v Moore*, 470 Mich 56, 62; 679 NW2d 41 (2004).  The "evident purpose of the statute is to enhance the penalty for carrying" a firearm while committing a felony and "thus deter the use of guns," *id.*, but it is not a sentence enhancement.  Rather, "the Legislature intended to create a separate crime distinct from the felony or attempted felony . . . ."  *Wayne Co Prosecutor v Recorder's Court Judge*, 406 Mich 374, 389; 280 NW2d 793 (1979), overruled in part on other grounds as recognized in *Moore*, 470 Mich at 62.  Indeed, it is not necessary for a defendant to actually be convicted of the predicate felony to be convicted of felony-firearm; a defendant can even be *acquitted* of the predicate felony and still be found guilty of felony-firearm.  *People v Lewis*, 415 Mich 443, 453-454; 330 NW2d 16 (1982).  This is all to say that felony-firearm is a distinct offense that is punished separately from the predicate felony.  From this, it logically follows that any limitations period applicable to felony-firearm should be independent of the limitations period applicable to the underlying felony.

With this in mind, we believe that, because there is no statute specifying that any other limitations period applies, felony-firearm must be subject to the catchall limitations period of six years in MCL 767.24(10).  And because defendant was not charged with for felony-firearm within the applicable six-year period, the charge was time-barred.  The failure to dismiss defendant's felony-firearm count was therefore error.

While the statute of limitations that applies to felony-firearm appears to be an issue of first impression, we conclude that, under the circumstances, the error of not dismissing that count because it was time-barred was plain.  The only plausible reading of MCL 767.24 is that felony-firearm is subject to the catchall limitations period in MCL 767.24(10).  Indeed, while the prosecution does not endorse this opinion's reading of the statute, it offers no alternative interpretation.  This, in our estimate, is because there simply is not a principled basis for reaching

---

[2] We pause to note that defendant was not actually indicted.  But MCL 767.2 provides that MCL 767.24's use of the term "indictment" applies equally to prosecutions commenced by filing an information, as was the case here.  *People v Blackmer*, 309 Mich App 199, 200 n 1; 870 NW2d 579 (2015).

a contrary result. That the six-year statute of limitations in MCL 767.24(10) applies to defendant's felony-firearm prosecution "is not subject to reasonable dispute," so the error of allowing that count to stand was plain. *Allen*, 507 Mich at 614.

As for the final prong of plain-error review, it is obvious that defendant was prejudiced by this plain error. He was convicted of, and sentenced for, an offense for which he should not have been prosecuted. More than that, the conviction added additional years to his sentence because a sentence for felony-firearm runs consecutively to the predicate felony. See MCL 750.227b(3). And allowing a conviction to stand that is premised on a time-barred charge seriously affects the fairness, integrity, and public reputation of the proceedings irrespective of defendant's innocence. See *Allen*, 507 Mich at 614 (explaining that reversal is only warranted under plain-error review if the plain "error resulted in the conviction of an actually innocent defendant" or the "error seriously affected the fairness, integrity or public reputation of judicial proceedings") (quotation marks and citation omitted). Therefore, under plain-error review, we conclude that defendant's felony-firearm conviction must be vacated, and remand this case to the trial court for that court to dismiss the conviction.[3]

### III. CHALLENGES TO EVIDENCE

Defendant next raises a series of challenges to various evidentiary rulings made by the trial court. A trial court's decision to admit evidence is reviewed for an abuse of discretion. *People v Dixon-Bey*, 321 Mich App 490, 512; 909 NW2d 458 (2017). To the extent that a trial court's decision to admit evidence involves a preliminary legal determination, "such as whether a rule of evidence precludes admitting of the evidence," the issue is reviewed de novo. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). Insofar as defendant's arguments raise constitutional concerns, constitutional issues are reviewed de novo. *People v Skinner*, 502 Mich 89, 99; 917 NW2d 292 (2018).

### A. PRISON INTERVIEW

Defendant argues that the trial court erred by allowing the recorded conversation between Horn and defendant to be played for the jury because the statement was obtained in violation of defendant's Fifth and Sixth Amendment rights under the United States Constitution, as applied to the states through the Fourteenth Amendment.

---

[3] In light of this conclusion, it is unnecessary to address defendant's argument that his counsel provided ineffective assistance by failing to move to dismiss defendant's felony-firearm charge on grounds that it was barred by the statute of limitations.

## 1. FIFTH AMENDMENT

The Fifth Amendment of the United States Constitution guarantees an individual the right against self-incrimination. See US Const, Am V.[4] To protect this constitutional guarantee, police must administer *Miranda*[5] warnings before conducting a "custodial interrogation." *People v Mathews*, 324 Mich App 416, 424-425; 922 NW2d 371 (2018). For an interrogation to be "custodial," the suspect must be in "custody." See *People v Steele*, 292 Mich App 308, 316; 806 NW2d 753 (2011). "Custody" in this context is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *People v Barritt*, 325 Mich App 556, 562; 926 NW2d 811 (2018). *Miranda* warnings are not required "whenever a suspect is in custody in a technical sense"; they are required only when the "essential ingredients of a police-dominated atmosphere" and coercion are present. *Illinois v Perkins*, 496 US 292, 296-297; 110 S Ct 2394; 110 L Ed 2d 243 (1990) (quotation marks and citation omitted). It follows that ploys designed to mislead a jailed or imprisoned suspect, or to "lull him into a false sense of security," do not trigger *Miranda*'s protections unless the ploy "rise[s] to the level of compulsion or coercion." *Id*. at 297. See also *People v Fox*, 232 Mich App 541, 552; 591 NW2d 384 (1998). "Coercion is determined from the perspective of the suspect." *Perkins*, 496 US at 296.

When defendant spoke with Horn, he was in custody in the technical sense—he was incarcerated. But defendant's conversation with Horn did not occur in the type of coercive atmosphere giving rise to *Miranda* concerns. From defendant's perspective, see *id*., he was merely talking with his girlfriend, and he surely believed that he was free to terminate the conversation at any time. See *Barritt*, 325 Mich App at 562 (explaining that whether a defendant is "in custody" for purposes of requiring *Miranda* warnings turns in part on whether "a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave") (quotation marks, citation, and alteration omitted). Indeed, given defendant's threatening attitude toward Horn, it is difficult to imagine that he was intimidated by her or thought that she had any power or authority over him, official or otherwise. See *Perkins*, 496 US at 297 (explaining that "it should not be assumed" that a suspect is being coerced "[w]hen the suspect has no reason to think that the listeners have official power over him"). While the police used Horn to deceive defendant and "lull him into a false sense of security," *id*., nothing about this deception or the circumstances surrounding defendant's conversation with Horn compelled or coerced defendant to talk to her. It follows that *Miranda* warnings were not required, and defendant's Fifth Amendments right against self-incrimination was not violated.

## 2. SIXTH AMENDMENT

The Sixth Amendment of the United States Constitution guarantees criminal defendants the right to the assistance of counsel. US Const, Am VI.[6] Once an individual's Sixth Amendment

---

[4] While our state constitution contains a similar guarantee, see Const 1963, art 1, § 17, defendant grounds his argument in the federal constitution.

[5] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[6] Our state constitution has a similar guarantee. See Const 1963, art 1, § 20. While defendant references our state constitution in passing, he does not rely on it when making his argument.

right to counsel attaches, any statements deliberately elicited from him without permitting him the assistance of counsel must be excluded as violative of that right. *Massiah v United States*, 377 US 201, 206; 84 S Ct 1199; 12 L Ed 2d 246 (1964). The right to counsel attaches at "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Rothgery v Gillespie Co, Texas*, 554 US 191, 198; 128 S Ct 2578; 171 L Ed 2d 366 (2008) (quotation marks and citations omitted). The right might attach before then if an investigation has become so focused and targeted that the suspect has, "for all practical purposes, already been charged." *Escobedo v Illinois*, 378 US 478, 484-486; 84 S Ct 1758; 12 L Ed 2d 977 (1964). But the right generally does not attach until adversary judicial proceedings are formally initiated, even if the government has sufficient evidence to arrest the suspect. *Hoffa v United States*, 385 US 293, 309-310; 87 S Ct 408; 17 L Ed 2d 374 (1966).

The Sixth Amendment right to counsel "is offense specific." *McNeil v Wisconsin*, 501 US 171, 175; 111 S Ct 2204; 115 L Ed 2d 158 (1991). This means that, even if the right attached to one offense, a suspect's incriminating statements about a different crime to which the right has not yet attached "are, of course, admissible at a trial" for the other crime. *Id*. at 176 (quotation marks and citation omitted).

Here, defendant was incarcerated for reasons unrelated to the present case when he spoke with Horn. At the time, defendant had not been charged with Taylor's murder, and would not be so charged for years. In other words, when defendant spoke with Horn, no adversary judicial proceedings had been initiated against defendant for Taylor's death. While it is plausible or even likely that Scott suspected that defendant was involved in Taylor's murder at the time given that he asked Horn to wear a recording device, this merely shows that the government was investigating defendant's potential involvement in the crime, which falls woefully short of the exception to the initiation-of-adversary-judicial-proceedings requirement identified in *Escobedo*. We therefore conclude that, when defendant spoke to Horn, he did not yet have a Sixth Amendment right to counsel as it relates to Taylor's murder, so that right could not have been violated.

## B. POLYGRAPH REFERENCE

Defendant next takes issue with the trial court's decision to allow Schweinsberg's testimony that defendant was trying "to figure out how to pass a polygraph test."

"The bright-line rule that evidence relating to a polygraph examination is inadmissible is well established." *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003). This rule bars not only the results of a polygraph examination but evidence about whether a polygraph examination was administered or refused. See *People v Ray*, 431 Mich 260, 265; 430 NW2d 626 (1988); *People v Kahley*, 277 Mich App 182, 183; 744 NW2d 194 (2007); *People v Frechette*, 380 Mich 64, 72-73; 155 NW2d 830 (1968). Stated differently, this rule bars evidence relating to an actual polygraph examination, including the results of such an examination, whether one was administered, whether the defendant was asked to take one, and whether the defendant was willing or unwilling to take one. This prohibition stems not only from the scientific unreliability of polygraph examinations but from the "judicial concern" that jurors "will give disproportionate weight to the results [of polygraph examinations] and consider the evidence as conclusive proof of guilt or innocence." *Ray*, 431 Mich at 265.

Schweinsberg's disputed testimony did not fall within this prohibition on polygraph-related evidence because the testimony was not related to an actual polygraph test. Rather, Schweinsberg testified that defendant became concerned with the mere prospect of a polygraph examination after Taylor's murder, from which a jury could infer defendant's consciousness of guilt. It is well-established that evidence demonstrating a defendant's consciousness of guilt is relevant. See *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995). A jury may infer consciousness of guilt from evidence that a defendant was attempting to evade responsibility, such as evidence that defendant was lying or being deceptive, see *People v Unger*, 278 Mich App 210, 227; 749 NW2d 272 (2008), that defendant fled the scene of the crime, *People v Goodin*, 257 Mich App 425, 432; 668 NW2d 392 (2003), or that the defendant destroyed or hid evidence or sought to conceal their involvement in a crime, *People v Kowalski*, 489 Mich 488, 508-509 & 509 n 37; 803 NW2d 200 (2011). Schweinsberg's testimony that defendant was trying "to figure out how to pass a polygraph test" fits squarely within this type of relevant evidence.

It is true that this evidence could have an innocuous explanation, but it could also be consistent with a fear of being investigated for Taylor's murder. What significance to give to Schweinsberg's disputed testimony, if any, was for the jury to decide. And when the jury did so, it would not have the type of polygraph-related evidence before it that raises concerns—nothing that the jury heard suggested that defendant took a polygraph, was asked to take a polygraph, or was willing or unwilling to take a polygraph. It follows that there was no danger that the jury would draw the improper credibility inferences from Schweinsberg's disputed testimony that the prohibition against polygraph evidence is intended to curb. See *Ray*, 431 Mich at 265. In short, defendant's desire to learn "how to pass a polygraph" was not the kind of polygraph-related evidence that the jury would use improperly, it was relevant to defendant's consciousness of guilt,[7] and it was merely one of several pieces of evidence suggesting that defendant wished to conceal the extent of his involvement in Taylor's death.[8] The trial court did not err by admitting this evidence.

---

[7] Defendant briefly contends that Schweinsberg's disputed testimony was inadmissible under MRE 403 because its probative value was substantially outweighed by the danger of unfair prejudice. The evidence was, of course, prejudicial to defendant in the way that all evidence tending to establish a defendant's guilt is prejudicial. But it was not *unfairly* prejudicial because it did not inject considerations extraneous to the merits of the case. See *People v Pickens*, 446 Mich 298, 336-337; 521 NW2d 797 (1994). And considering the relevance of the evidence, the evidence's probative value was certainly not *substantially* outweighed by the danger of unfair prejudice as required to preclude the evidence under MRE 403.

[8] Other evidence suggesting that defendant wished to conceal the extent of his involvement in Taylor's death included that defendant's .38 revolver went missing after Taylor was murdered, that he came home "in a rage" after an individual kept "talking about a gun that was buried," and that defendant's interest in defeating a polygraph coincided with his obsessively washing his hands with bleach.

## C. OTHER-ACTS EVIDENCE

Defendant next contends that the trial court erred by allowing evidence of other acts of domestic violence.

At the time of defendant's trial, MCL 768.27b(1)[9] provided, in relevant part:

[I]n a criminal action in which the defendant is accused of an offense involving domestic violence or sexual assault, evidence of the defendant's commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under [MRE] 403.

MCL 768.27b is an exception to the general bar against propensity evidence in MRE 404(b)—"in prosecutions for offenses involving domestic violence or sexual assault, MCL 768.27b permits evidence of a defendant's prior commission of domestic violence or sexual assault to show the defendant's character or propensity to commit such acts." *People v Berklund*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367568); slip op at 8. "[T]he prior act does not have to be identical to the charged offense to be relevant and possibly admissible under MCL 768.27b." *Id*. at ___; slip op at 9. The statute itself defines "domestic violence" and an "offense involving domestic violence," see MCL 768.27b(6)(a), and the defendant's past conduct and current charge need only fit into these definitions to fall within the statute's ambit. See *People v Railer*, 288 Mich App 213, 220; 792 NW2d 776 (2010).

Defendant's alleged offense of murdering Taylor, with whom he had a dating relationship, clearly fits the definition of an "offense involving domestic violence." See MCL 768.27b(6)(a)(*i*) (defining an "offense involving domestic violence" as "[c]ausing or attempting to cause physical or mental harm to a family or household member"); MCL 768.27b(6)(b)(*iv*) (defining "family or household member" to include "[a]n individual with whom the person has or has had a dating relationship"). And his past alleged conduct of beating Schweinsberg, with whom he also had a dating relationship, clearly fits the definition of "domestic violence." See MCL 768.27b(6)(a)(*i*); MCL 768.27b(6)(b)(*iv*). Defendant was therefore charged with an offense involving domestic violence, so his other acts of domestic violence against Schweinsberg were admissible unless excluded under MRE 403. MCL 768.27b(1).

MRE 403 provides:

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

---

[9] MCL 768.27b was amended by 2024 PA 184, effective April 2, 2025. This opinion refers exclusively to the statute as it was written at the time of defendant's trial. See MCL 768.27b, as amended by 2018 PA 372**.**

"Unfair prejudice" for purposes of MRE 403 does not exist merely because evidence is "damaging" to the defense. *People v Thurmond*, 348 Mich App 715, 730; 20 NW3d 311 (2023). Rather, it "exist[s] where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008). "[W]hen applying MRE 403 to evidence admissible under MCL 768.27b, courts should weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect." *Berklund*, ___ Mich App at ___; slip op at 10.

Defendant's MRE 403 argument hinges on his contention that the other-acts evidence presented at his trial had little to no relevance—an argument we readily reject. Evidence of defendant's past conduct towards Schweinsberg was relevant to show that defendant was controlling, deceitful, and, in particular, exceptionally violent toward his relationship partners. On that last point, Schweinsberg's testimony that was relevant to show not only that defendant physically abused his relationship partners, but that the abuse included shooting them—albeit, in Schweinsberg's case, with batteries—and using his revolver to inflict harm. Schweinsberg's testimony was also relevant to show that defendant lacked self-control and would commit acts of serious violence toward his partners. True, nothing suggested that defendant had killed a partner before. But Schweinsberg's testimony demonstrated "defendant's propensity to commit violent acts against women," *Berklund*, ___ Mich App at ___; slip op at 9, and given the particularly violent conduct Schweinsberg described, defendant's shooting Taylor would have merely been a step up from defendant's typical behavior, not wholly out of character. When considered along with the other evidence, Schweinsberg's testimony about defendant's other acts of domestic violence was probative of whether defendant murdered Taylor, which weighs in favor of admission under MRE 403. *Berklund*, ___ Mich App at ___; slip op at 10. Defendant's contention that the evidence "had little probative value, if any at all," is simply wrong. See *People v Engelman*, 434 Mich 204, 243 n 23; 453 NW2d 656 (1990) (LEVIN, J., concurring) (explaining that "propensity evidence is logically relevant" because "[a] person who has committed an offense may be more likely to commit that or another offense than a person who has not committed that or any other offense").

Defendant does not explain how Schweinsberg's testimony was unfairly prejudicial for reasons other than a lack of relevance, and has therefore not shown that the evidence should have been excluded under MRE 403. We accordingly conclude that the trial court properly admitted the other-acts evidence under MCL 768.27b.[10]

## IV. JAIL CREDIT

Defendant preserved this issue by asking the trial court for jail credit at his sentencing. See *Heft*, 299 Mich App at 78. Whether a defendant is entitled to credit for time served in jail before sentencing is reviewed de novo. *People v Armisted*, 295 Mich App 32, 49; 811 NW2d 47 (2011).

---

[10] Because we conclude that the other-acts evidence was properly admitted under MCL 768.27b, we do not address whether the evidence was admissible under MRE 404(b).

-11-

In Michigan, concurrent sentencing is the default, and a consecutive sentence can only be imposed if authorized by statute. *People v Baskerville*, 333 Mich App 276, 289; 963 NW2d 620 (2020). MCL 769.11b grants a person convicted of a crime credit for the time they served in pretrial detention, stating:

> Whenever any person is hereafter convicted of any crime within this state and has served any time in jail prior to sentencing because of being denied or unable to furnish bond for the offense of which he is convicted, the trial court in imposing sentence shall specifically grant credit against the sentence for such time served in jail prior to sentencing.

MCL 768.7a(2) provides that if a person commits a felony while on parole, the felony conviction runs consecutive to the remaining sentence of the paroled-offense, stating:

> If a person is convicted and sentenced to a term of imprisonment for a felony committed while the person was on parole from a sentence for a previous offense, the term of imprisonment imposed for the later offense shall begin to run at the expiration of the remaining portion of the term of imprisonment imposed for the previous offense.

When defendant was charged in this case, he was either on parole or about to be granted parole for a 2011 offense. Defendant committed the offense at issue in this case in 2010. Obviously, defendant could not have committed an offense in 2010 while on parole for an offense he committed a year later, and the prosecution concedes that defendant was not on parole in 2010. Therefore, the plain language of MCL 768.7a(2) is inapplicable, and MCL 769.11b applies. We accordingly remand for defendant to have the opportunity to establish any jail credit to which he is entitled and, if he can do so, for correction of his judgment of sentence to reflect that jail credit.

## V. STANDARD 4 BRIEF

Defendant makes a series of ineffective-assistance-of-counsel arguments in his Standard 4 brief. "Ordinarily, whether a defendant has been denied effective assistance of counsel is a mixed question of fact and law—the trial court's factual findings supporting its decision are reviewed for clear error, while the court's determination of whether those facts violated the defendant's right to the effective assistance of counsel is reviewed de novo." *People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021). Defendant in this case failed to obtain an evidentiary hearing, "so there are no factual findings to which this Court must defer," and our review is "limited to errors apparent on the record." *Id*.

To establish a claim of ineffective assistance, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Defendant "bears the burden of establishing the factual predicate" of his claim. *Haynes*, 338 Mich App at 430.

Defendant first takes issue with his trial counsel's alleged mishandling of Schweinsberg's testimony; he complains that Schweinsberg's testimony should have been excluded because it was unsupported by other evidence. While it is true that Schweinsberg's testimony was not necessarily

-12-

corroborated by other evidence, "[t]he people are not required to offer evidence corroborating a witness's testimony when she testifies from her own personal knowledge, as the credibility of the witness is a question for the jury." *People v Alexander*, 142 Mich App 231, 234; 370 NW2d 8 (1985). Defendant additionally complains that Schweinsberg testified in exchange for a generous plea agreement arising out of the death of her own child, but that fact was before the jury. Indeed, it was explored at length by both the prosecutor and defendant's trial counsel, and it is not clear what more defendant believes his trial counsel should have done to bring this issue to the jury's attention. Defendant's arguments thus fail to identify anything objectively unreasonable about his trial counsel's handling of Schweinsberg's testimony.[11]

Defendant next argues that his trial counsel was ineffective for failing to seek an interlocutory appeal challenging the admissibility of defendant's recorded conversation with Horn. For the reasons explained above, however, evidence of defendant's conversation with Horn was properly admitted. Trial counsel cannot have been ineffective for failing to pursue a futile appeal. See *People v Serges*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 355554); slip op at 14.

Defendant further contends that his trial counsel deprived defendant of a defense by failing to call witnesses to support defendant's alleged alibi theory. But defendant does not say—let alone provide an offer of proof as to—how those witnesses would have testified. "Without some indication that a witness would have testified favorably, a defendant cannot establish that counsel's failure to call the witness would have affected the outcome of his or her trial." *People v Carll*, 322 Mich App 690, 703; 915 NW2d 387 (2018).

Defendant lastly argues that his trial counsel coerced him into giving up his right to testify. Putting aside the fact that defendant was placed under oath and testified unequivocally that he made the decision not to testify, defendant provides no offer of proof as to what his testimony would have been or how it would have helped him. See *People v Solloway*, 316 Mich App 174, 189-190; 891 NW2d 255 (2016) (explaining that a defendant fails to support an ineffective-assistance claim related to missing testimony if he fails to explain "what the missing testimony would have been" or how the testimony "would have assisted his case"). Without such an offer of proof, defendant cannot establish the factual predicate of his ineffective-assistance claim.

## VI. CONCLUSION

For the reasons explained in this opinion, defendant's second-degree-murder conviction is affirmed, but his felony-firearm conviction is vacated. We further remand this case for the trial court to dismiss defendant's felony-firearm conviction, provide defendant with an opportunity to establish any jail credit to which he is entitled, and correct his judgment of sentence accordingly.

---

[11] In an affidavit attached to his Standard 4 brief, defendant argues that his trial counsel did not adequately cross-examine Schweinsberg, but he does not explain what questions his counsel should have asked but did not.

-13-

Affirmed in part, vacated in part, and remanded for further proceedings.  We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Michael J. Kelly
/s/ Daniel S. Korobkin